Gordon M. AMBACH, Commissioner of Education of the State of New York, et al.

v.

T. H. BELL, Secretary of Education, et al., Appellants.

Gordon M. AMBACH, Commissioner of Education of the State of New York, et al.

v.

T. H. BELL, Secretary of Education Dr. Wayne Teague, Alabama State Superintendent of Education, et al., Appellants,

Wayne Teague, Alabama State Superintendent of Education, et al., Intervenors.

Nos. 82–1762, 82–1769.

United States Court of Appeals, District of Columbia Circuit.

Argued July 23, 1982.
Decided Aug. 17, 1982.

---

**85.** Szewczuga-Treichel Br. at 23–25.

**86.** App. at 11–14.

William Kanter and Neil H. Koslowe, Attys., Dept. of Justice, Washington, D. C., were on the emergency motion for summary reversal or in the alternative, for stay pending appeal filed by appellant T. H. Bell, Secretary of Educ., in No. 82–1762.

David C. Long, Washington, D. C., was on the emergency motion of intervenors-appellants for summary reversal or in the alternative for stay pending appeal in No. 82–1769.

Ariel L. Mendez and Angel A. Valencia-Aponte, San Juan, P. R., were on the response of the Puerto Rico Secretary of Educ., intervenor-appellee, to the emergency motions of appellant and intervenors-appellants for summary reversal or in the alternative for stay pending appeal.

Robert Abrams, Atty. Gen., State of N. Y., Howard L. Zwickel and Paul M. Glickman, Asst. Attys. Gen., State of N. Y., New York City, Francis X. Bellotti, Atty. Gen., Com. of Mass., Boston, Mass., Jane Nelson, Deputy Atty. Gen., State of Nev., Carson City, Nev., Eugene J. Sullivan, Asst. Atty. Gen., State of N. J., Trenton, N. J., and David L. Wilkinson, Atty. Gen., State of Utah, Salt Lake City, Utah, were on the response in opposition to emergency motions for summary reversal or in the alternative stay pending appeal in Nos. 82–1762 and 82–1769.

Before ROBINSON, Chief Judge, and WILKEY and BORK, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

The representatives of a number of States (the plaintiff States) brought suit in the District Court to enjoin the Secretary of Education (the Secretary) from distributing funds under the Education Consolidation and Improvement Act of 1981 using data from the 1970 census. In dispute is the allocation of $276 million earmarked for educationally disadvantaged children. The District Court granted the plaintiff States a preliminary injunction, and the Secretary appealed, requesting summary reversal or, in the alternative, a stay pending appeal. After receiving memoranda from the Secretary and the plaintiff States, as well as from representatives of States that had intervened in the trial court supporting use of the 1970 census data (the intervenor States), and from fifty members of Congress as amici curiae, we heard oral argument on the motions on July 23, 1982. Later that day, we granted the motion for summary reversal by issuing an order that vacated the District Court's order and dissolved the preliminary injunction. We now write to explain our decision.

## I. BACKGROUND

The Education Consolidation and Improvement Act of 1981 (ECIA), Pub.L.No. 97–35, 95 Stat. 463, was enacted on August 13, 1981, as part of the Omnibus Budget Reconciliation Act of 1981, Pub.L.No.97–35, 95 Stat. 357. Chapter 1 of the ECIA continues the program of federal financial assistance for educationally deprived children by making payments to state educational agencies "on the basis of entitlements created under title I of the Elementary and Secondary Education Act of 1965 [ESEA] and calculated in accordance with provisions of that title in effect on September 30, 1982." Id. § 553 (to be codified at 20 U.S.C. § 3802). Congress established the program as a "forward funding" program, which means that "funds appropriated in any fiscal year to carry out activities under this subtitle shall become available for obli-

gation on July 1 of such fiscal year and shall remain available for obligation until the end of the succeeding fiscal year." Id. § 594 (to be codified at 20 U.S.C. § 3874). See generally S.Rep.No.139, 97th Cong., 1st Sess. 904 (1981), U.S.Code Cong. & Admin. News 1981, p. 396; House Comm. on the Budget, 97th Cong., 1st Sess., The Congressional Budget Process 98, 106 (Comm.Print 1981).

The method of allocating funds under title I of the ESEA, which applies to the ECIA chapter 1 allocations in dispute here, is given in 20 U.S.C. § 2711 (Supp. IV 1980). When the Secretary "determines that satisfactory data for that purpose are available," he calculates a State's allocation by multiplying the number of children counted under subsection 2711(c) by 40% of the average per-pupil expenditure, so long as the average per-pupil expenditure is no less than 80% and no more than 120% of the average per-pupil expenditure in the United States. 20 U.S.C. § 2711(a)(2)(A).[1] If the total congressional appropriation for chapter 1 exceeds the amount appropriated for fiscal year 1979, half the excess is allocated to the States under a formula based on data from the 1975 Survey of Income and Education conducted by the Bureau of the Census. Id. § 2711(a)(3)(D).

Under subsection 2711(c), three groups of children are counted: (1) children aged 5 to 17 from families below a specified poverty level, see id. § 2711(c)(2)(A); (2) children aged 5 to 17 from families above the current poverty level who receive aid to families with dependent children, see id. § 2711(c)(2)(B); and (3) children aged 5 to 17 living in institutions for neglected or delinquent children or being supported in foster homes by public funds, see id. § 2711(c)(1)(A)(iii). This case centers on the method for making the first count of children. The statute provides:

> For the purposes of this section, the [Secretary] shall determine the number of children aged five to seventeen, inclusive, from families below the poverty lev-

---

1. Puerto Rico and the District of Columbia are treated as States, although Puerto Rico's basic allotment is calculated by a different formula. See 20 U.S.C. § 2711(a)(2)(C).

el on the basis of the most recent satisfactory data available from the Department of Commerce for local educational agencies (or, if such data are not available for such agencies, for counties); and in determining the families which are below the poverty level, the Commissioner shall utilize the criteria of poverty used by the Bureau of the Census in compiling the 1970 decennial census.

*Id.* § 2711(c)(2)(A).

It is possible, of course, that Congress will not appropriate sufficient funds to pay in full the total amounts to which the local educational agencies (generally school districts) are entitled. In that event, the allocations must be ratably reduced to the extent necessary to bring the total allocation within the amount appropriated. *See id.* § 2843. In addition, if this ratable reduction causes any local educational agency to receive less than 85% of the amount it had been allocated for the preceding fiscal year, its allocation must be increased to the 85% level. The funds for this increase are derived by "proportionately reducing" the allocations of the remaining local educational agencies. *Id.* § 2843(a).

Each year, the Secretary of Education calculates the allocation to each county using the method described above. The possibility of ratable reductions requires that the allocations for all States and their counties take place at once. The States must then distribute the funds appropriately among the local educational agencies in each county. A State in which a large number of local educational agencies overlap county boundaries may apply to the Secretary for authority to receive the State allocation directly to its own State educational agency and to allow that agency to make the further allocations to local educational agencies without regard to counties. *See id.* § 2711(a)(3)(C). The State educational agency must provide assurances, however, that "such allocations will be made using precisely the same factors for determining a grant as are used under [section 2711.]" *Id.*

Since 1973, the Secretary has used data from the 1970 census to calculate the number of children in families below the poverty level. During early 1982, it appeared that appropriate data from the 1980 census would not be available until the fall of 1982. On February 12, 1982, the Department of Education issued proposed rules for chapter 1 of the ECIA, noting that "[i]t is unlikely that poverty data from the 1980 census will be available before the end of next summer." 47 Fed.Reg. 6584, 6584 (1982). The notice continued, "It is the Department's current intention to use 1970 census data in determining county aggregate allocations of Chapter 1 funds for the 1982–83 school year." *Id.*

Generally the Secretary notifies all States simultaneously of their exact dollar entitlements through a "Notice of Entitlement." These figures are then used by the States to compute allocations for each educational agency or school district. A second notice, the "Notification of Grant Award" is sent to each State after it has submitted and received approval from the Secretary of its application for funds. This notification indicates that the State has met all legal requirements associated with the grant award. *See* 20 U.S.C. § 2832. The Notification of Grant Award is for the same amount as that in the Notice of Entitlement, but the time it is transmitted to each State will depend on when that State has met all its legal requirements.

Around April 21, 1982, the Bureau of the Census indicated that it anticipated that by the first week in June the 1980 census data, from which chapter 1 allocations could be made, would be available. Nonetheless, the Secretary on May 14, 1982 issued an "ECIA Chapter 1 Program Directive," advising each State of the chapter 1 allotments that its local educational agencies could expect to receive on a countywide basis for the coming school year. The allotments were based on countywide data on the number of children from families below the poverty level as measured in the 1970 census. On May 20, 1982, the Secretary promulgated a "Memorandum to Chief State School Officers," which explained his reasons for using the 1970 census data rather than waiting for the 1980 data.

On May 27, 1982, the plaintiffs, ten States and three New York schoolchildren representing a class of chapter 1 eligible children in New York State, filed a class action in the District Court for the District of Columbia, seeking a judgment declaring unlawful and unconstitutional the Secretary's planned distribution of funds on the basis of the 1970 census data. The action also seeks to prohibit the Secretary from allocating funds based on those data and to require him to allocate funds based on 1980 census data.

The plaintiff States also filed a motion for preliminary injunction to enjoin distribution of funds based on the allocations the Secretary had announced. After a hearing, the District Court issued on June 30, 1982 an order granting the motion for preliminary injunction, enjoining any distribution of funds in excess of the 85% of last year's funds that is guaranteed under 20 U.S.C. § 2843(a).

In an accompanying memorandum, the District Court explained its reasons for granting the preliminary injunction. First, that court found that the plaintiffs had demonstrated a sufficient likelihood of success on the merits to warrant a preliminary injunction because the Secretary had not provided an adequate rationale for using the 1970 data rather than waiting for the more recent 1980 data. In summary of this point, the court stated:

> After evaluating the reasons the Secretary has given to support his May 14 decision to use 1970 census data, it is apparent that plaintiffs have demonstrated a sufficient likelihood of success to merit the granting of preliminary injunctive relief. Both of the alleged legal barriers to the use of the 1980 data appear unfounded. It is unlikely that technical modifications could not be made in the "criteria of poverty" for the 1980 census and even if no alterations could be made, the Secretary could have recalculated the 1980 census data absent the technical modifications within a short period of time. It is equally as unlikely that the unavailability of 1980 census

data for Puerto Rico inhibits the Secretary from using 1980 census data for the fifty states and the District of Columbia. Merely hypothesizing legal challenges that are unlikely to be sustained is insufficient to uphold an administrative decision that contradicts the primary goal of Title I. Although the Secretary did claim that his decision was intended to further state planning, there has been such uncertainty in Title I funding due to the rescission proposal and the instant litigation that perhaps only negligible state planning has occurred. Eighty-five percent of all Title I funds could be made available on July 1 with the remainder distributed once the final calculations for the 1980 census data are made which the Secretary concedes would be no later than mid-July. Hence, the Secretary's decision does not appear to enhance state planning and does not make Title I funds available to the states more than a few days earlier than if 1980 census data were used. Despite media reports of the Secretary's view that he would be sued regardless of the nature of his decision, the Secretary has no license to decide in a manner which totally frustrates the major goal of Title I which is to direct funds to low-income children.

Memorandum Opinion (Mem. Op.) at 12–13 (footnote omitted).

As to irreparable harm, the District Court noted the uncontroverted fact that once the chapter 1 funds are distributed to the States, they cannot be recouped. On the other hand, the court felt its analysis of the likelihood of success demonstrated that planning by the States would "not be significantly impaired" by the granting of an injunction, and there was no indication that injuries that may result will be irreparable. Finally, the court held that the public interest strongly favored "pursuing the goal plaintiffs seek to vindicate of targeting Title I funds to areas where low-income children are located in spite of minor delays in the distribution of a portion of those funds to the States." *Id.* at 14.

The Secretary and the intervenor States have appealed the grant of preliminary injunction. *See* 28 U.S.C. § 1292(a) (1976). Each has moved for summary reversal or, in the alternative, a stay of the injunction pending appeal. This court received memoranda in support of and in opposition to the motions, as well as a brief amici curiae in behalf of fifty members of Congress. On July 23, 1982, we heard oral argument on the motions and vacated the District Court's order, dissolving the preliminary injunction.

## II. DISCUSSION

"[A] party who seeks summary disposition of an appeal must demonstrate that the merits of his claim are so clear as to justify expedited action." *Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.) (per curiam) (summary affirmance) (citing *United States v. Allen,* 408 F.2d 1287, 1288 (D.C.Cir.1969) (per curiam) (summary reversal)), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980). Our decision whether expedited disposition of an appeal is justified is informed not only by the utility of further briefing and argument, but also by the circumstances of the case. If, as in this case, a lengthy appeal will exacerbate disruptive delays in a federal program in which time is of the essence, the public interest counsels a speedy resolution. The parties have extensively briefed the case and have presented oral argument. It is appropriate that we resolve without delay the appeal of preliminary injunction that is before us. We conclude that the motion for summary reversal should be granted.

The factors to be considered in granting interim relief are (1) whether the petitioner has made a strong showing that he is likely to prevail on the merits; (2) whether petitioner has shown that without such relief he will be irreparably injured; (3) whether a grant of relief will work irreparable harm on others; and (4) whether the public interest favors interim relief. *See Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam). These considerations are interdependent. The per-

suasiveness of petitioner's threatened irreparable harm is greatly diminished when its prevention will visit similar harm on other interested parties. *See id.* And the required likelihood of success will vary with the balance of other factors. *See WMATC v. Holiday Tours, Inc.,* 559 F.2d 841, 843–44 (D.C.Cir.1977).

It is well settled that whether a preliminary injunction shall be awarded rests in the sound discretion of the trial court. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Meccano, Ltd. v. Wanamaker,* 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822 (1920). This court will not ordinarily disturb the order of the District Court granting or denying a preliminary injunction except for abuse of discretion or clear error. *Maryland-National Capital Park & Planning Comm'n v. U. S. Postal Service,* 487 F.2d 1029, 1035 (D.C.Cir.1973); *Southern Ry. v. Brotherhood of Locomotive Firemen & Enginemen,* 384 F.2d 323, 326 (D.C.Cir.1967). If our review of the trial court's action reveals that it rests on an erroneous premise as to the pertinent law, however, we must examine the decision in light of the legal principles we believe proper and sound. *See Delaware & Hudson Ry. v. United Transportation Union,* 450 F.2d 603, 620 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). In that event, "[t]he reversal of the trial judge in no way reflects a determination that he was unreasonable or arbitrary, or chargeable with an abuse of discretion, but only and simply that his premise as to the applicable rule of law is deemed erroneous by the appellate court." *Id.* at 620–21.

In *NRDC v. Morton,* 458 F.2d 827 (D.C.Cir.1972), Judge Leventhal explained this principle more fully:

[A] greater amplitude of judicial review is called for when the appeal presents a substantial issue that the action of the trial judge was based on a premise as to the pertinent rule of law that was erroneous. Not only the avowed forecast as to probability of success on the merits, but also the analysis of injury to either or

both parties, the public interest, and the balancing of interests, may well come to depend on an assumption of underlying legal premise. When this can be identified, the appellate court furthers the interest of justice by providing a ruling on the merits to the extent that the matter is ripe, though technically the case is only at the stage of application for preliminary injunction. And a reversal based on a disagreement with the underlying legal premise of the trial court is not based on, or to be construed as, a determination of arbitrary abuse of judicial discretion.

Similarly this court's function extends to disposition on motion for summary reversal—when the critical issue in cases of public moment, and the appraisal of the possibility of irreparable harm to the public interest, depend on the applicable legal premise. This conception of the motion for summary reversal does not require that the case be free of troublesome issues, but is rather based on the approach that there is a public interest in expedition in extraordinary cases, whether the appeal is brought by Government or others, and that the case is ripe for decision, e.g., is unlikely to turn significantly on fact findings or further legal researches, as in legislative history.

*Id.* at 832. *See also Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1242–43 (D.C.Cir. 1980); *Energy Action Educational Foundation v. Andrus,* 631 F.2d 751 (D.C.Cir.1979); *National Wildlife Federation v. Snow,* 561 F.2d 227 (D.C.Cir.1976).

While the court in many of the cases cited above proceeded to determine conclusively the merits of the underlying suit, we restrict our review to the preliminary injunction that has been appealed. *See Maryland-National, supra,* 487 F.2d at 1041. We do not hesitate, however, to delve into the merits of the controversy to the extent

necessary for evaluation of the case before us. We conclude that the plaintiff States have little, if any, likelihood of eventual success on the merits and that the District Court has markedly underestimated the harm spawned by delay in distributing the funds at issue. When this harm is balanced against the irreparable harm facing the plaintiff States, their tenuous claim clearly does not support a grant of interim relief. The public interest in timely allocation of funds to States further strengthens our conclusion that the preliminary injunction must be dissolved.

### A. *Likelihood of Success on the Merits*

■ The paramount question on the merits is whether the Secretary's decision of May 14 to use 1970 census data, as explained in the memorandum of May 20, should be overturned as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[2]

The statute and legislative history are replete with references to the goal of targeting these funds to school districts that have more educationally disadvantaged children. The statute requires the Secretary to use the "most recent satisfactory data available" in making the allocation of funds. *See* 20 U.S.C. § 2711(c)(2)(A). The statutory declaration of policy declares that "the policy of the United States [is] to provide financial assistance ... to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means." *Id.* § 2701. Further, section 1521 of the 1978 amendments to the ESEA provides:

For the purpose of establishing a reliable statistical basis for the rendering of determinations under section 111(c)

---

**2.** A group of student plaintiffs in the District Court asserted that the Secretary's decision denied them equal protection. We wholeheartedly agree with the trial court that "where equal protection violations are alleged in the context of economic regulation, the appropriate standard of review is one of limited scrutiny in which there must be a rational basis for the

legislation." *See* Mem. Op. at 3 n.*. We also agree that this claim is most likely weaker, and certainly no stronger, than the claims based on the "arbitrary and capricious standard." *See San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

[2711(c) ] . . ., the Secretary of Commerce shall take such steps as may be necessary to ensure that data developed from the 1980 decennial census will be available to the Secretary of Education identifying data for children under 18 years of age, by single year of age, for school districts. ESEA § 1521, Pub.L.No.95–561, 92 Stat. 2378 (1978).

The plaintiff States argue that this evident concern for accurate targeting of funds left the Secretary no choice but to wait for the 1980 census data, which he knew would soon be available. The District Court apparently found this argument likely to prevail. After framing the question as whether "it is likely that the Secretary's decision to use 1970 census data was arbitrary and capricious because it is allegedly inconsistent with the statutory purposes of Title I," Mem. Op. at 7, the court concluded that "the Secretary ignored the primary statutory purpose of directing funds to the locations of the intended beneficiaries." *Id.* at 8.

The intervenor States and congressional amici, on the other hand, contend that the 1970 census data *must* be used, even if 1980 census data are both satisfactory and available. Relying on legislative history of title 1 of the ESEA, they argue that the distribution scheme codified at section 2711 was the result of a delicate compromise that not only assumed 1970 census data would be used but also compensated for shifts in population by changing other factors to favor States that had a relative increase in educationally disadvantaged children. They interpret the purpose of section 1521 as ensuring that Congress will have appropriate data for its next review of the allocation algorithm, and they make the commonsense assertion that a Congress that fiercely debated every jot and title of a distribution scheme did not intend that its results should be radically altered by use of new data.

■ Many of the arguments presented on both sides rapidly lose sight of the underlying question. At issue is not whether the Secretary must use the 1970 data or the 1980 data if both are before him. The question on the merits is whether the Secretary's decision in mid-May to allocate funds based on 1970 data without waiting for the 1980 data was arbitrary and capricious or not in accordance with law.

There is no plausible argument that this decision was not in accordance with law. On May 14, the 1970 data were not only the most recent satisfactory data available,. they were the only satisfactory data available. Although more recent data existed as to the number of children below the poverty level, these data were not broken down by counties, an essential requirement of the statute. If the Secretary erred, it was not by choosing the 1970 data out of the universe of available data. Instead, his error, if any, must be failure to wait until more recent, possibly satisfactory data were available for calculation of chapter 1 allotments.

■ In *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275 (D.C.Cir.1981), we summarized the standard that must be applied in reviewing the Secretary's decision:

This "arbitrary and capricious" standard of review is a highly deferential one, *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 541 F.2d 1, 34 (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), which presumes the agency's action to be valid. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *National Small Shipments Traffic Conference, Inc. v. CAB,* 199 U.S.App. D.C. 335, 342, 618 F.2d 819, 826 (1980). This standard is viewed as a narrow one, which forbids a court from substituting its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823; *Montana Power Co. v. EPA,* 608 F.2d 334, 344 (9th Cir. 1979); *Ethyl Corp. v. EPA, supra,* 541 F.2d at 34. The standard mandates judicial affirmance if a rational basis for the agency's decision is presented, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42

L.Ed.2d 447 (1974); *Ethyl Corp. v. EPA, supra,* 541 F.2d at 34; even though we might otherwise disagree, *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).

*Id.* at 283 (footnote omitted). The decision must be based on consideration of all relevant factors, *Citizens to Preserve Overton Park, supra,* 401 U.S. at 419, 91 S.Ct. at 825, with reasons that "do not deviate from or ignore the ascertainable legislative intent." *Ethyl Corp. v. EPA, supra,* 541 F.2d at 35–36 (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).

The Secretary's reasons for using the 1970 census data are set forth in his memorandum of May 20 (see Appendix). In evaluating the likely success of a challenge to these reasons, the District Court at each turn decided that the Secretary's explanations were weak because he could have waited for the 1980 data without great harm to State planning. That analysis misses the point: the question is not whether the Secretary could have done otherwise, but whether his chosen course of action was arbitrary and capricious.

Our review of the May 20 memorandum convinces us that there is little, if any, possibility of mounting a successful attack on the Secretary's decision. In seven numbered paragraphs, the Secretary set forth his reasons why he "concluded that satisfactory 1980 census data will not be available early enough to use such data as the basis for allocation of Chapter 1 funds for the school year 1982–83." The memorandum notes early on the statutory requirement that the most recent satisfactory available data be used to make the allocations. Assuming that the intervenor States are not correct in their assertion that use of the 1970 data is statutorily mandated, it is not possible to argue plausibly that the Secretary has ignored the statutory concern for the use of recent data.

In the memorandum's first numbered paragraph, the Secretary set forth his major reasons for not waiting for the 1980 census data:

> School districts need to know of fund allocations in sufficient time to set budgets, release or employ teachers and other personnel, and plan Chapter 1 projects. Given the enormous number of school systems affected, this requires more time than would be available for the coming school year if we waited for the receipt and processing of 1980 census data. Indeed, the reason this program is forward-funded by the Congress is to provide this needed time.

Although the plaintiff States have argued that the Secretary has overestimated the importance of advance notice for planning, it is irrefutable that late notification of available funds can retard the efficiency and effectiveness of educational programs. As the Secretary points out, Congress has provided for early availability of chapter 1 funds in order to allow proper planning and early commitment of funds. *See* 20 U.S.C. § 3874. In fact, it is arguable that the language of the statute—"funds ... shall become available for obligation on July 1" —mandates early distribution of funds to the States and their educational agencies.

In addition, the ECIA explicitly recognizes the need for adequate planning of the funded programs and projects. Each local educational agency must give assurances that its programs and projects for the educationally disadvantaged "are designed and implemented in consultation with parents and teachers of such children." ECIA § 556 (to be codified at 20 U.S.C. § 3805(b)(3)). It is clearly appropriate for the Secretary to balance the need for accurately targeting chapter 1 funds with the need for adequate planning of use of those funds.

In paragraph four the Secretary estimated that it would take four to six weeks to process the 1980 census data after they were received from the Bureau of the Census. He noted that the accuracy of the tables provided must be verified and that adjustments must be made for approximately 25 counties that have been modified

since the last census. Although plaintiff States have argued that this could be accomplished somewhat more quickly, at oral argument their counsel was unable to assert that there was not a reasonable factual basis for the Secretary's estimate of the delay that would be caused by waiting for the promised 1980 data.

The Secretary, in paragraph five, emphasized that additional delays would occur at the State level, stemming from the need to make suballocations within each State and the need in some cases to design new methods of suballocation. He noted that in seven States, comprising almost one quarter of the school districts receiving funds, suballocations are not made along county lines, as permitted in 20 U.S.C. § 2711(a)(3)(C). This subsection requires that a suballocation that does not follow county lines must be made "using precisely the same factors for determining a grant" as are used to calculate allocations under section 2711. This would necessitate the use of 1980 census tract data, which, at the time the Secretary made his decision, were not expected to be available until late 1982 or early 1983. The Secretary concluded, "it would be difficult, if not impossible, for them to develop another system in the interim which would be consistent with the law."

The District Court and the plaintiff States argue that subcounty allocations pose no impediment to use of 1980 data. The District Court noted that the Secretary conceded at oral argument in that court that 1980 subcounty data would be available by midsummer. There is no indication, however, in the arguments of the parties or the opinion of the District Court that the Secretary's mid-May estimate of when the data would be available was inaccurate when it was made. There is no clearer example of improper second-guessing by courts than the use of actual data to invalidate agency estimates that were reasonable when made.

The District Court also dismissed the Secretary's concern that use of the 1980 data for the section 2711 calculation would mandate that those States that do not suballo-cate along county lines wait for 1980 data to calculate their suballocations. *See* Mem. Op. at 10 n.**. The court quoted legislative history to the effect that "States possess broad discretion" in the choice of data to make suballocations. *See* H.R.Rep.No.1137, 95th Cong., 2d Sess. 14 (1978), U.S.Code Cong. & Admin.News 1978, p. 4971. Unfortunately, the quoted passage is completely irrelevant to the problem envisioned by the Secretary in his May 20 memorandum.

The Secretary was concerned about those States that do not allocate along county lines. Before the ESEA was amended in 1978, no explicit provision was made for such allocations. *See* 20 U.S.C. § 241c (1976) (repealed 1978). The District Court quoted language from a National Institute of Education study that described practices under the old law. *See* H.R.Rep.No.1137, 95th Cong., 2d Sess. 12 (1976). Concern for these practices led to an amendment to allow suballocations that do not conform to county lines, but only if "the factors used by the State in making its allocations [are] the same as those used in Title I." *See id.*, U.S.Code Cong. & Admin.News 1978, p. 4982.

Similarly, the District Court cited Department of Education regulations that allow a State to use the "best available data" to make subcounty allocations. *See* 34 C.F.R. § 201.12(b) (1981). The Secretary was concerned, however, with those States that allocate aggregate county allotments without regard to county lines. The regulations for those allocations specifically require that a State make its suballocations "using the same factors as the Secretary uses in determining the amount of grants under section [2711]." *See* 34 C.F.R. § 201.-13 (1981). It is not necessary for us to decide whether these provisions require that a state give weight to the same counts of various children or, alternatively, that these provisions also require that the same data be used to make the counts. It is abundantly clear in either case that the Secretary was not arbitrary or capricious in his concern that some States might face an unpleasant choice between waiting an en-

tire school term before making suballocations and making immediate allocations using illegal factors that could result in the loss of funding altogether.

In sum, the Secretary in paragraphs one, four, and five expressed his concern that the delay caused by using the 1980 census data was not justified. At the time he made his decision, this delay appeared to be from six to eight weeks long, during the peak planning period for school administrators. Standing alone, the Secretary's concerns appear eminently rational and well founded, and nothing in either the plaintiff States' arguments or the District Court's post hoc evaluation changes that apparent conclusion.

In numbered paragraph two, the Secretary asserted that the States expect that the 1970 census data will be used. He cited as a basis for this the notice in the *Federal Register* of February 12, 1982, and a letter to Senator Hatfield, Chairman of the Appropriations Committee, who had urged use of the 1980 data. The District Court apparently accepted the argument of the plaintiff States that no reasonable expectations as to funding level could have been formed because until late April the levels at which the program would be funded was unclear. The plaintiff States have also submitted

affidavits that indicate that an estimate of allotments given the State of California was based on the 1980 data.

These arguments have little or no merit. It may well be that some States expected, or hoped, that the 1980 data would be available and would be used. And some staff members of the Department of Education may have predicted that the 1980 data would be used.[3] But this does not diminish the reasonableness of the Secretary's assertion that as a whole the States were expecting 1970 data to be used. His conclusion rested on official statements in the *Federal Register* and official communications with a responsible member of Congress. It is reasonable for States to rely on such pronouncements and just as reasonable for the Secretary to expect that they will do so.

The arguments of the plaintiff States go beyond merely challenging the Secretary's conclusion that the States anticipated use of the 1970 data. They also contend that States could have done little planning in the face of budgetary uncertainty. The District Court stated:

[I]t was not until May 14, 1982, that the states knew with certainty what decision the Secretary would make. The instant suit, filed only two weeks after the Secre-

---

**3.** The plaintiff States proffer an intra-Department memorandum by D. J. Benish as evidence that the Department announced the 1980 data would be used if made available during the first week in June. This memorandum informed the Secretary of the anticipated availability of 1980 census data in early June. The memo does state that the staff of some Senators had been informed that it was the intention of the Department staff to use the 1980 data if the Census Bureau could meet its June delivery date. It also states, "The States will be notified that this is a possibility so that local educational agencies may plan accordingly."

This internal memorandum is an element of the agency's decisional process. Far from contradicting the Secretary, it supports his position. The memo states, "[T]he States and local educational agencies have planned programs for the coming school year under the assumption that allocations would be determined on the basis of the poverty data from the 1970 census . . . ." It speaks of the "likely" availability of 1980 data and the "controversy and pressure" that a shift to 1980 data could cause

"since the States have not been warned and the local educational agencies have already planned programs and hired staff for the coming school year." It also alerts the Secretary to "at least one inconsistency which makes it unclear as to whether [the statute] intended that the census data be updated to 1980." In closing, the memo opines that the delay inherent in use of the 1980 data should not be a hardship because "most agencies will be operating on a carryover basis." It is unclear whether this statement refers to hardship from lack of planning time, already addressed in the memo as a problem, or hardship from nonavailability of the funds for immediate obligation beginning in July.

Although the memorandum leaves no doubt that the Secretary's staff notified some interested parties and perhaps some States that the 1980 data might be used, it also indicates the problems that could result from the shift to new data. The final decision rests with the Secretary, and the States were entitled to rely on his official pronouncements.

tary's decision, theoretically allowed the states only two weeks of planning.

Mem. Op. at 9. It may well be true that uncertainty as to funding levels was common before the Secretary made his decision. But this was the very reason for making the decision, and the primary rationale for use of the 1970 data was to eliminate the uncertainty. That this litigation subsequently cast some doubt on the allotments announced by the Secretary is of no import. Parties cannot disturb reasonable agency decisions by litigiously delaying their implementation. At the risk of redundancy, we again note that the issue on the merits is whether the Secretary's decision was reasonable when made, and not whether he could have done otherwise or whether he would be compelled to make a different decision at this point.

The Secretary's third numbered paragraph notes that the expected 1980 data do not encompass Puerto Rico, which must be treated as a state for purposes of ratable reductions. The Secretary stated that in the past the Department had not used different data sources for different States in making chapter 1 allotments and he "would question the legality and equity of such an action." The plaintiff States urge that this imposes no impediment to use of the 1980 data because substitute data could be used for Puerto Rico, and such data had been used to calculate grants under other programs.

Allotments to States under chapter 1 of the ECIA, as calculated pursuant to title I of ESEA, are interdependent. One State's funds may be reduced based on the count of children in another State. It may be, as the plaintiffs assert, that it would not be illegal to use different sources of data for different States, but the equity of such an approach is certainly questionable. There is no indication that the Secretary's concern for the legality and equity of using differing data sources is arbitrary or capricious, even though he might have decided otherwise. We can perceive no possible basis for successful challenge in the Secretary's comment in regard to Puerto Rico.

The Secretary also commented in numbered paragraph six that use of 1970 data for the 1982–83 school year would not extend the use of this census data beyond their normal 10-year cycle. Although we agree with the plaintiff States that this does not compel the Secretary to use those data, we see no basis for challenge in his factually accurate statement. This is a minor piece of support for the Secretary's decision, and although it perhaps would not support the decision standing alone, it certainly does not transform the Secretary's decision into arbitrary or capricious action.

Finally, in numbered paragraph seven, the Secretary referred to other possible legal and administrative problems that could arise from use of the 1980 census data. He noted in particular that "the Bureau of the Census may have used criteria of poverty which are inconsistent with the law." Section 2711 requires that the Secretary count children aged 5 to 17 who are from families below the poverty line according to the "criteria of poverty used by the Bureau of the Census in compiling the 1970 decennial census." 20 U.S.C. § 2711(c)(2)(A). The criteria of poverty used in the 1980 census differed in at least three respects from those used in 1970. First, the matrix of maximum incomes to family size was expanded. Second, differences based on the sex of the head of household were eliminated. And third, distinctions between urban and rural families were eliminated.

The plaintiff States contend that these changes are merely technical and do not affect the validity of the counts of children that would be produced. Further, the counts of children apparently could be recomputed by early July using the 1970 criteria. From this the District Court concluded that "alleged problems with the 'criteria of poverty' appear to provide no basis to forego the use of the 1980 census data." Mem. Op. at 11. We cannot agree. First, we are hard pressed to understand how a six-week delay can provide "no basis" for the Secretary's decision. It may not be an adequate basis standing alone, and it may not be a basis that would convince everyone

to do likewise. But it certainly is a rational concern that should be considered by an administrative decisionmaker. Second, the "technical" changes may not be important in the evaluation of some, but the language of the statute is clear, and it requires the use of 1970 criteria of poverty. It is hardly arbitrary and capricious for the Secretary to be concerned that he might transgress the plain meaning of his congressional mandate.

It is instructive to take a step away from the details of the May 20 memorandum and to survey the Secretary's decision as a whole. The Secretary had to choose between the 1970 census data already before him and 1980 census data that had been informally promised for delivery in early June. He does not control the Bureau of the Census, and he could not be sure that the data he received would be accurate or on time. His best estimate was that it would take him four to six weeks to process the data and calculate county allocations. His experience as an educator made him concerned for the adverse impact this delay might create on planning by local and state educational agencies. He also foresaw many potential legal, equitable, and practical problems with use of the 1980 data. He decided to use the 1970 data.

Perhaps the Secretary would have chosen otherwise had time not been a factor. But each day of delay in his decision was another day lost to States that were trying to plan their programs for the following year. With this consideration in mind, the Secretary made his decision and offered his eminently rational reasons for that decision. The plaintiff States argue vociferously that the legal problems are no barrier, so long as the statute is interpreted as they desire and so long as the statute's plain meaning can be ignored when it clashes with their preferences. They argue that the Secretary need not be concerned with educational planning because often in the past adequate planning has not been performed. They ask the courts to substitute their judgment for that of the Secretary when evaluating possible equitable and practical problems.

This request must be denied. "[A court's] enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). When the Secretary's decision is viewed with appropriate deference, it becomes clear that there is little if any chance that it will eventually be found arbitrary and capricious.

### B. *Harm Threatened the Plaintiff States*

Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits. We agree with the District Court that this second factor from *Virginia Petroleum Jobbers* favors the grant of interim relief.

### C. *Harm Threatened Others*

The District Court determined that, were a preliminary injunction granted, "the state's planning of [chapter 1] will not be significantly impaired and that the states should receive all their [chapter 1] funds no later than they have received them in recent years." Mem. Op. at 14. The court continued, "[T]he Secretary and [intervenor States] have failed to indicate that any injuries that may result will be irreparable." *Id.* We cannot agree.

The Secretary's announcement of chapter 1 ECIA allocations in mid-May was designed to allow States adequate time to plan their programs for the educationally disadvantaged. It is undisputed that planning for the school year commences in the prior spring. Numerous decisions and commitments must be made by local school districts, and parents must also choose among school systems that will offer differ-

ing levels of remedial programs based on the Secretary's funding decision. Congress recognized the importance of educational planning and conditioned receipt of funds for educationally disadvantaged children on assurances by the local educational agencies that the programs developed would be "designed and implemented in consultation with parents and teachers of such children." ECIA § 556 (to be codified at 20 U.S.C. § 3805(b)(3)).

Funds spent without adequate planning and preparation cannot be effectively and efficiently deployed. The delays caused by the preliminary injunction that was granted cannot help but disrupt the efforts of educators and retard the education of the disadvantaged children sought to be aided by the federal grants. It is palpable error to assert that continued uncertainty as to funding levels will not significantly disrupt and retard the achievement of the statutory goals. Nor is this problem greatly mitigated by distribution of the 85% of last year's fund that each State is guaranteed. It is the marginal decision, the additional program, and the added teacher that are at stake. A delay that impairs the usefulness of over a quarter billion dollars in educational aid cannot be termed insignificant.

It is true that States will eventually receive their appointed allotments of funds. But this will be a Pyrrhic victory if those funds are received too late to be effectively employed in the education of disadvantaged children. The harm sustained during the term of any preliminary injunction must undoubtedly be considered irreparable. And this harm must be weighed in the decision whether to grant interim relief.

### D. *The Public Interest*

In this case, as in most cases, it is difficult to evaluate the public interest without in some way returning to the merits. Certainly this was the approach of the trial court, which concluded that the public interest strongly favors the goal of allocating funds based on the most recent census. We do not gainsay the importance of ensuring that these federal funds reach the proper

children. Yet, as we have shown, there is little if any possibility that the funds will be distributed based on the 1980 census. And we must respect the decision of the Secretary as reflecting the best interests of the public in his expert judgment. The Secretary clearly concluded that it was most important that the monies at issue be allocated to States expeditiously to allow the States to use them wisely. We will not second-guess this conclusion.

The statute requires planning by local educational agencies. In these times of tight federal budgets, it is even more important that each dollar appropriated be spent as effectively as possible. And it is undisputed that each dollar will be used to the benefit of disadvantaged children, no matter which data are used to allocate the funds. In light of the overwhelming probability that the Secretary will prevail in this action, we are led to conclude that the public interest favors rapid distribution of these funds to the States.

### III. CONCLUSION

Evaluation of the four *Petroleum Jobbers* factors together indicates that the injunction should be dissolved. Although the plaintiff States will suffer irreparable harm if the injunction is lifted, its continuation will also cause irreparable harm to other States. We agree with the District Court that the harm threatened the plaintiff States is greater and more severe than that facing the intervenor States, but our evaluation of the merits indicates that the balance is closer than the trial court perceived.

As we said in *Petroleum Jobbers*, "injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits." 259 F.2d at 925. Having applied the appropriate standard of judicial review to the Secretary's decision, we perceive little, if any, possibility that plaintiffs will eventually prevail on the merits. "Without such a substantial indication of probability of success, there would be no justification for the court's intrusion into

the ordinary processes of administration and judicial review." *Id.* There is a close balance of equities and a minuscule probability of success on the merits, and the public interest indicates that we should minimize the disruptive impact of delaying the Secretary's decision. Without hesitation, we conclude that the preliminary injunction was improvidently granted based on an erroneous premise of law, and must be dissolved. Therefore we grant the motion for summary reversal.

*Reversed.*

APPENDIX

*Memorandum To Chief State School Officers*

The statutory requirement governing which data are to be used in allocating funds under Chapter 1 of the Education Consolidation and Improvement Act of 1981 (ECIA) states that those shall be "... the most recent satisfactory data available from the Department of Commerce ..." 20 U.S.C. 2711(c)(2)(A). I have concluded that satisfactory 1980 census data will not be available early enough to use such data as the basis for allocation of Chapter 1 funds for the school year 1982–83. Following are the reasons for this decision:

1. School districts need to know of fund allocations in sufficient time to set budgets, release or employ teachers and other personnel, and plan Chapter 1 projects. Given the enormous number of school systems affected, this requires more time than would be available for the coming school year if we waited for the receipt and processing of 1980 census data. Indeed, the reason this program is forward-funded by the Congress is to provide this needed time.

2. The States have expected us to use 1970 data. All indications we have had from the Census Bureau up until about a month ago were that 1980 county data would not be ready until late summer or early fall of 1982.

   a. We included a statement in the *Federal Register* on February 12 with the introduction of the Chapter 1 regulations which stated: "It is unlikely that poverty data from the 1980 census will be available before the end of next summer. It is the Department's current intention to use 1970 census data in determining county aggregate allocations of Chapter 1 funds for the 1982–83 school year."

   b. On April 8, I wrote to Senator Hatfield, Chairman of the Appropriations Committee, reiterating that we will be using 1970 census data for the 1982–83 school year. Senator Hatfield had urged the use of 1980 data.

3. I still have no official word of any change from the Department of Commerce, but an unofficial estimate is that data may be transmitted early next month. These data would not include Puerto Rico which must be treated as a State. Puerto Rico data are not expected until late summer. We have never used different data sources for different States and would question the legality and equity of such an action.

4. It will take our National Center for Education Statistics at least four-to-six weeks to process the data for use once they are received from Census. In addition to verifying the accuracy of tables provided by Census, adjustments will have to be made in approximately 25 counties which have been modified, abolished or created between censuses to assure the application of the 85 percent hold harmless for school districts between the previous year and the current year.

5. After allocations are made to the States, the State education agencies must make sub-allocations that go to their school districts except in those relatively few States that have only county-unit school districts. These sub-allocations will require added time at the State level. It must also be emphasized that over half of the States use census tract data to make sub-allocations within counties for their school districts. These States would not have 1980 census tract data (the smallest unit) available until possibly the

first of next year and would have to make allocations on old data which would not reflect the change in 1980 or would have to design a new allocation basis.

In addition, seven States which include almost 25 percent of the school districts served use a provision of law which allows direct allocation from State to school district where there are large numbers of districts which cross county lines. That authority requires that they use exactly the same data base that we use for making the county allocations and they could not even begin to allocate until the 1980 census tract data are received, once again, possibly early next year. It would be difficult, if not impossible, for them to develop another system in the interim which would be consistent with the law.

6. We are not extending the use of the 1970 census data beyond its normal 10-year cycle. The 1970 census data were first used in 1973–74 and we will be using 1980 census data in 1983–84.

7. There are some other possible legal and administrative problems which may and probably will arise. One of these problems is that the Bureau of the Census may have used criteria of poverty which are inconsistent with the law. We should be able to iron out these in the coming year, but at the present time they add to the difficulty in using 1980 census data.

In view of the foregoing, it is not possible to make a reasonably effective transition to a new census data base using 1980 data prior to the school year 1983–84. Based upon my own experience on the local, State and national levels, I know that this decision is the most reasonable one to be made.

/s/ T. H. Bell
T. H. BELL