UNITED STATES of America

v.

**Fred M. GLOVER, aka Blackbuster, Appellant.**

No. 83–2088.

United States Court of Appeals, District of Columbia Circuit.

April 6, 1984.

Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the motion was filed), Michael W. Farrell and Theodore Shmanda, Asst. U.S. Attys., Washington, D.C., were on the motion for summary affirmance, for appellee.

Kenneth M. Robinson, Washington, D.C., was on the opposition to the motion for summary affirmance, for appellant.

Before WILKEY and MIKVA, Circuit Judges, and McGOWAN, Senior Circuit Judge.

**PER CURIAM:**

This appeal came before the motions panel of the court on the Government's motion for summary affirmance. Defendant-appellant Fred M. Glover was tried by a jury on two drug-related counts and one count of possession of a prohibited weapon. When the members of the jury were unable to agree on a verdict, the trial court, over Glover's objection, declared a mistrial. Glover claimed that the fifth amendment's double jeopardy clause barred his subsequent retrial and he filed a motion to prohibit retrial and to dismiss the indictment. The trial court denied Glover's motion and scheduled the case for retrial; Glover appealed.[1] We concluded that the merits of the appeal were "so clear as to justify expedited action" and to "make summary affirmance proper." *Walker v. Washington*, 627 F.2d 541, 545 (D.C.Cir.) (per curiam), *cert. denied*, 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980). In order to permit Glover's retrial to proceed without further delay, we issued an order affirming the district court's denial of Glover's motion to prohibit retrial. *United States v. Glover*, No. 83–2088 (Dec. 16, 1983). We write now to explain that decision.

## I.

Fred M. Glover was arrested on March 12, 1983, and was charged by indictment on March 23, 1983, with one count each of possession with intent to distribute cocaine,[2] possession of cocaine,[3] and possession of a prohibited weapon (a blackjack).[4] Glover entered pleas of not guilty on all counts. At his trial, which began on September 19, 1983, Glover's defense consisted of a denial of the charges and the assertion of an affirmative defense that the police officers involved in his arrest were trying to frame him with fabricated evidence.

---

1. In *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Supreme Court held that defendants may seek immediate appellate review of such pretrial orders rejecting defendants' double jeopardy claims.

2. 21 U.S.C. § 841(a) (1982).

3. 21 U.S.C. § 844 (1982).

4. D.C.Code § 22–3214(a) (1981).

The trial was completed on September 21, 1983, and the jury met for one hour that evening. After it reconvened on the morning of September 22, the jury sent three separate notes to the court, asking various evidentiary questions concerning lighting conditions, the preliminary drug field test, fingerprint examinations, and whether the jury could review portions of the transcript pertaining to the police officers' seizure of the cocaine. The judge instructed the jury that the transcript was not available, that their recollections of the evidence controlled their deliberations, and that they could consider only evidence properly admitted during the trial. The jury resumed deliberations and, at 3:40 p.m. that afternoon, sent a fourth note to the court, signed by the foreman, stating: "We cannot reach a unanimous decision, so please advise." In response, the judge read the *United States v. Thomas*[5] charge pertaining to deadlocks to the jury and asked it to continue deliberating for another hour before recessing.

After the jury had reconvened on the morning of Friday, September 23, the jury requested the court to reread its instructions on "the definition of evidence, reasonable doubt, common sense, facts and the duties and responsibilities of a juror." The court reread several instructions to the jury and gave the jury a second *Thomas* charge. The court denied, however, a request by Glover's counsel that the jury be read the bracketed material in D.C. Criminal Jury Instructions No. 2.11, Credibility of Witness,[6] pertaining to inconsistencies or discrepancies in witnesses' testimony. The jury resumed deliberations and more than three hours later, at 3:02 p.m., it sent the court a note signed by the foreman, stating: "We, the jury, have come to the conclusion that we are irretrievably and irreconcilably deadlocked." Although Glover's counsel suggested that the jury

5. *United States v. Thomas,* 449 F.2d 1177, 1184–85 n. 46, 1187 (D.C.Cir.1971) (en banc). The *Thomas* charge instructs deadlocked juries that each member is to consult with other jurors and to be open to reexamination of his or her views, but that jurors should not surrender their honest beliefs solely to return a verdict.

6. D.C. Criminal Jury Instructions No. 2.11, including the bracketed portion that Glover's counsel requested, states:

In determining whether the government has established the charge against the defendant beyond a reasonable doubt, you must consider and weigh the testimony of all the witnesses who have appeared before you.

You are the sole judge of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and the extent to which any witness should be believed. If there is any conflict in the testimony, it is your function to resolve the conflict and to determine where the truth lies.

In reaching a conclusion as to the credibility of any witness, and in weighing the testimony of any witness, you may consider any matter that may have a bearing on the subject. You may consider the demeanor and the behavior of the witness on the witness stand; the witness' manner of testifying; whether the witness impresses you as a truthful individual; whether the witness impresses you as having an accurate memory and recollection; whether the witness has any motive for not telling the truth; whether the witness had a full opportunity to observe the matters concerning which he has testified; whether the witness has any interest in the outcome of this case, or friendship or animosity toward other persons concerned with this case.

[Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. Two or more persons witnessing an incident or transaction may see or hear it differently; an innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of the discrepancy, always consider whether it pertains to a matter of important or unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.]

You may consider the reasonableness or unreasonableness, the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether he has been contradicted or corroborated by other credible evidence.

If you believe that any witness has shown himself to be biased or prejudiced, for or against either side in this trial, you may consider and determine whether such bias or prejudice has colored the testimony of such witness so as to affect the desire and capability of that witness to tell the truth.

You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

would resolve its deadlock if the court read the jury Instruction No. 2.11, including the bracketed language, the judge stated his intent to declare a mistrial. The court indicated in its memorandum opinion:

The Court expressed its concern to counsel that the jury had been deliberating a long time considering the drug and weapon charges at issue, that they had noted their inability to reach a unanimous verdict after being read the *Thomas* charge and, based on its finding that there was no satisfactory alternative, declared its intention to declare a mistrial. When the defendant objected to the declaration of a mistrial and asked the Court to once again instruct the jury to continue deliberating, the Court stated that it was not inclined to do so since an instruction to keep deliberating might pressure them and result in their subsequently finding the defendant guilty.

*United States v. Glover*, Crim. No. 83–55, slip op. at 2 (D.D.C. Oct. 13, 1983). When the jury was brought back into the courtroom, the court asked the foreman whether the jury was still "irretrievably and irreconcilably deadlocked," and whether further deliberations would resolve the deadlock. After the foreman stated that further deliberations would not resolve the deadlock, the court declared a mistrial.

On September 27, 1983, Glover filed a motion to prohibit retrial and to dismiss the indictment on double jeopardy grounds. The district court denied the motion and scheduled the case for a second trial to commence on December 19, 1983. Glover appealed the district court's denial of his motion to prohibit retrial, and the United States filed a motion for summary affirmance.

## II.

▮ A party who seeks summary disposition asks this court to dispose of an appeal on the merits, often before the court has had the benefit of full briefing and oral argument. Because of the serious consequences that flow from granting summary disposition, the court imposes on a party who requests summary affirmance or summary reversal a "heavy burden," *United States v. Allen*, 408 F.2d 1287, 1288 (D.C. Cir.1969) (per curiam): the movant "must demonstrate that the merits of his claim are so clear as to justify expedited action," *Walker v. Washington*, 627 F.2d 541, 545 (D.C.Cir.) (per curiam), *cert. denied*, 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980). Before it grants summary disposition of an appeal, the court must conclude that further briefing and argument are not necessary. *See Ambach v. Bell*, 686 F.2d 974, 979 (D.C.Cir.1982) (per curiam).

▮ The circumstances of this appeal make it especially suited for expedited disposition. Although the district court's order denying Glover's motion to prohibit retrial is a "final decision" for purposes of 28 U.S.C. § 1291,[7] *see Abney v. United States*, 431 U.S. 651, 662, 97 S.Ct. 2034, 2042, 52 L.Ed.2d 651 (1977), it "is obviously not 'final' in the sense that it terminates the criminal proceedings in the district court," *id.* at 657, 97 S.Ct. at 2039. As long as Glover's appeal remained pending before this court, his retrial would be delayed, thereby increasing the risks—both to Glover and to the Government—that witnesses' memories would fade or that witnesses would become otherwise unavailable. This potential for delay was recognized by the *Abney* Court, which suggested that the "problems of delay can be obviated by rules or policies giving such appeals expedited treatment. It is well within the supervisory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims of former jeopardy." *Id.* at 662 n. 8, 97 S.Ct. at 2042 n. 8. Similarly, the Court of Appeals for the Ninth Circuit's recognition of the potential for "*Abney* appeals" to delay trials prompted that court to hold that the Government establishes irreparable injury

---

7. 28 U.S.C. § 1291 gives the United States Courts of Appeals jurisdiction of appeals "from all final decisions of the district courts of the United States, ... except where a direct review may be had in the Supreme Court."

for the purpose of invoking the court's emergency procedures "upon a showing that the trial of criminal cases will be significantly delayed in the absence of such procedures." *United States . v. Miranda-Parra*, 637 F.2d 610, 613 (9th Cir.1980) (per curiam); *cf. United States v. Yellow Freight Systems, Inc.*, 637 F.2d 1248, 1252 (9th Cir.1980), *cert. denied*, 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 84 (1981) ("Because the filing of an appeal allowable under *Abney* deprives the trial court of jurisdiction to proceed with trial, ... defendants delay their trial when they pursue *Abney* appeals. So that defendants need not completely forego speedy trial to seek vindication of the rights protected by *Abney*, we must adopt procedures to dispose of these appeals as quickly as fair consideration permits.").

■ Although the need for speedy resolution of this appeal so that Glover's retrial—if not barred on former jeopardy grounds—may proceed is an important factor in a decision to grant summary affirmance, other factors also make this case an appropriate one for summary disposition. This appeal, which comes before the court on undisputed facts,[8] presents a single,[9] uncomplicated legal issue to be decided in an area where the case law is well developed. That issue was well briefed in the parties' motion papers, and we determined that further briefing and argument "would not significantly aid the Court." *Walker v. Washington*, 627 F.2d at 542. Our review of the controlling case law makes it clear that the double jeopardy clause does not bar Glover's second trial, and we therefore grant the United States' motion for summary affirmance.

### III.

When the trial court declares a mistrial over the defendant's objection, as the trial

court did in this case, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *see United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971)—a right that is protected by the fifth amendment's double jeopardy clause. *See, e.g., Illinois v. Somerville*, 410 U.S. 458, 471, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425 (1973); *United States v. Jorn, supra; Wade v. Hunter, supra.*

■ Nevertheless, the defendant's interest in having his trial completed by a particular tribunal is not absolute: the right "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. at 689, 91 S.Ct. at 837; *see also Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978) (defendant's "valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury"); *United States v. Richardson*, 702 F.2d 1079, 1085 (D.C.Cir.), *cert. granted*, —— U.S. ——, 104 S.Ct. 231, 78 L.Ed.2d 224 (1983). The standard by which a court's declaration of mistrial without the defendant's consent is measured is one of "manifest necessity."

The "manifest necessity" standard was enunciated in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), in which the defendant claimed that the trial court's discharge of a hung jury barred his subsequent retrial for the same offense. The Court held that there was no legal bar to retrial of the defendant:

---

**8.** Glover adopted the statement of facts set forth in the United States' motion for summary affirmance.

**9.** Appeals from pretrial orders denying motions to bar retrial on former jeopardy grounds are permitted under the "collateral order" exception to the final judgment rule that was first announced in *Cohen v. Beneficial Industrial Loan*

*Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Defendants appealing such pretrial orders may raise other claims only if they also fall within the *Cohen* exception. *See Abney*, 431 U.S. at 663, 97 S.Ct. at 2042.

We think that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes .... But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests ... upon the responsibility of the Judges, under their oaths of office.

*Id.* at 580. Although the Court has consistently refused to pronounce "bright-line" rules delimiting when the manifest necessity standard has been met,[10] *see, e.g., Illinois v. Somerville,* 410 U.S. at 462–64, 93 S.Ct. at 1069–70; *United States v. Jorn,* 400 U.S. at 485–86, 91 S.Ct. at 557–58; since *Perez, the hung jury has remained "the prototypical example"* of manifest necessity to declare a mistrial. *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); *see, e.g., Logan v. United States,* 144 U.S. 263, 297–98, 12 S.Ct. 617, 627–28, 36 L.Ed. 429 (1892); *Wade v. Hunter,* 336 U.S. at 689, 69 S.Ct. at 837. ("There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict. In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again."); *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) ("The classic example [of permissible retrials after a jury has been discharged without reaching a verdict and without the defendant's consent] is a mistrial because the jury is unable to agree."); *United States v. Sanford,* 429 U.S. 14, 16, 97 S.Ct. 20, 21, 50 L.Ed.2d 17 (1976) (per curiam); *Arizona v. Washington,* 434 U.S. at 509, 98 S.Ct. at 832 ("[W]ithout exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial.").

In *United States v. Jorn,* 400 U.S. at 485, 91 S.Ct. at 557, a plurality of the Court cautioned that, absent a motion by the defendant for a mistrial, "the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option [to have his case go to a particular tribunal] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." Subsequent cases, however, have emphasized the trial court's "broad discretion" to declare a mistrial even over a defendant's objections, *see, e.g., Illinois v. Somerville,* 410 U.S. at 462, 93 S.Ct. at 1069, especially when the trial judge's decision is based on a belief that the jury is not able to reach a verdict, *see Arizona v. Washington,* 434 U.S. at 509, 98 S.Ct. at 832. In *Arizona* the Supreme Court, while stressing the "heavy burden" placed on the prosecutor to justify a declaration of mistrial over a defendant's objections, *id.* at 505, 98 S.Ct. at 830, indicated that in the hung jury situation,

there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if

---

**10.** The dissent cautions that double jeopardy questions must be resolved on a case-by-case approach. We agree, and have decided this case on its facts. That the Supreme Court "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial," *Illinois v. Somerville,* 410 U.S. at 462, 93 S.Ct. at 1069, does not mean that double jeopardy questions can never be disposed of summarily; nor does it mean that this court should ignore previous cases outlining the breadth of a trial judge's discretion to declare a mistrial in the hung jury situation.

he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

*Id.* at 509–10, 98 S.Ct. at 832 (footnotes omitted).

The reason for the great deference accorded a trial court's declaration of mistrial in the deadlocked jury situation "is that the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Id.* at 510 n. 28, 98 S.Ct. at 833 n. 28; *see also Gori v. United States*, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d

901 (1961) ("the trial judge ... is best situated intelligently to make ... a decision [whether] the ends of substantial justice cannot be attained without discontinuing the trial"). This does not mean that the trial judge's discretion to declare a mistrial is untrammeled or that the decision to declare a mistrial is insulated from review: "If the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Arizona v. Washington*, 434 U.S. at 510 n. 28, 98 S.Ct. at 833 n. 28. In the few cases in which appellate courts have held that a trial court's declaration of mistrial in the hung jury situation barred retrial of the defendant, the determination appears to have been based on the trial judge's failure to *exercise* an informed discretion, rather than his *abuse* of discretion. *See, e.g., United States v. Lansdown*, 460 F.2d 164 (4th Cir.1972) (retrial barred where trial judge, acting on his own motion, declared mistrial despite foreman's statement that jury was "on the verge" of a verdict).[11]

The trial court's actions in the instant case are in marked contrast to the type of summary, *sua sponte*, actions that have been held to bar retrial. The court declared the mistrial only after receiving two notes from the jury stating that it was deadlocked, giving the jury two *Thomas* charges, and questioning the foreman to ascertain whether further deliberations might result in a unanimous verdict. *Cf. United States v. See*, 505 F.2d 845, 851 (9th

---

**11.** Like *Lansdown*, other cases cited by Glover in which appellate courts have held a trial judge's declaration of mistrial erroneous have involved *sua sponte* action by the trial court. *See, e.g., United States v. Gordy*, 526 F.2d 631 (5th Cir.1976) (in trial pervaded by hurried atmosphere, 5½ hours after jury began deliberations on charges of conspiracy to possess and possession of marijuana, trial court *sua sponte* called jury in and asked foreman whether there was a "hung jury"—foreman gave unanimous not guilty verdict on conspiracy charge and stated at the bench that jury was split 6–6 on possession charge and court declared mistrial); *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034 (3d Cir.1975) (trial court, on its own motion, called jury in after approxi-

mately 6½ hours of deliberation, asked foreman whether jury could arrive at a unanimous verdict, and declared mistrial when foreman indicated that jurors could not reach unanimous verdict); *United States ex rel. Russo v. Superior Court*, 483 F.2d 7 (3d Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973) (trial judge, without any warning or consultation with either counsel, called the jury back to the courtroom after they had been deliberating for 15 hours in a murder trial, and asked the foreman whether the jury had arrived at a unanimous verdict—foreman responded that the jury had "not yet" reached a unanimous verdict and the judge declared a mistrial after deciding that the jury was too exhausted to be asked to deliberate longer).

Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975) ("The 'crucial factor' in determining the probability of agreement is a statement from the jury that it is 'hopelessly deadlocked.' "). The court was properly concerned that requiring further deliberations might coerce the jurors into a verdict. *See, e.g., Arizona v. Washington,* 434 U.S. at 509, 98 S.Ct. at 832; *cf. United States v. Lynch,* 598 F.2d 132 (D.C.Cir.1978) (per curiam), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979) (affirming judge's declaration of mistrial because presiding judge was ill and no other judge could take case —judge's concern that jury might be subject to pressure to decide case expeditiously supported declaration of mistrial). We can perceive no basis for concluding that the trial court abused its discretion in determining that it was manifestly necessary that a mistrial be declared.[12] Therefore, we grant the motion for summary affirmance.[13]

*Affirmed.*

MIKVA, Circuit Judge, dissenting:

I object to the summary affirmance of the decision of the trial court that subjects the defendant to a second criminal trial. It is not necessary to tarry on the merits of this case. My concerns address the procedure used by this court in rendering a decision on the merits; these concerns would not be alleviated even if the correctness of the result on the merits were beyond peradventure. That this case may present more of a challenge on the merits than the majority of this motions panel is willing to concede only serves to emphasize how deficient our procedures are in granting motions for summary affirmance, especially in criminal cases.

I have mixed emotions about the tenor of the majority opinion. On the one hand, the case has been given, *post hoc,* some of the concern and attention that usually is foreclosed by the use of summary disposition. In light of the careful and thoughtful attention that now has been given to the merits of the controversy, it is hard to remember that the case was summarily affirmed on the basis of a brief motion by the government, an even briefer response by the appellant-defendant, and only the briefest consideration by the two judges comprising the majority. On the other hand, my concerns about our process remain real. The majority's thoughtful opinion cannot erase the fact that major aspects of the normal appellate process were absent from our review of this appeal. For example:

1. There was no oral argument.

2. There was no trial transcript available.

3. There was none of the traditional collegiality of the decisional process normal to a multi-member appellate court.

The majority shrugs off my concerns in a footnote and suggests that these concerns can be better addressed in a judges' meet-

---

12. The dissent focuses on the trial court's decision not to read the jury one paragraph of a seven-paragraph instruction on witness credibility. We believe this is precisely the kind of situation contemplated by the Supreme Court when it observed that the trial court is best situated to determine whether further deliberations will produce a just verdict. *See Arizona v. Washington,* 434 U.S. at 510 n. 28, 98 S.Ct. at 832 n. 28. It should also be noted that this court has cited with approval the predecessor of the witness credibility instruction. *See United States v. Gaither,* 440 F.2d 262, 264 & n. 3 (D.C.Cir.1971); *United States v. Porter,* 429 F.2d 203 n. 1 (D.C.Cir.1970); *Stone v. United States,* 379 F.2d 146, 147 (D.C.Cir.1967). That predecessor instruction—like the instruction that the trial judge read to the jury in this case—did not contain the paragraph on which the dissent focuses. *See* Young Lawyers Section of D.C. Bar Ass'n Criminal Jury Instructions, Instruction 2.11 Comment (1978) ("This instruction modified instruction 2.11 in the 1972 edition to add an additional paragraph admonishing the jury concerning the evaluation of inconsistencies and discrepancies in witness testimony.").

13. Although the dissent expresses reservations about the merits of this appeal, the dissent focuses for the most part on the procedures established by this court for the consideration and disposition of motions. These latter concerns are more appropriately addressed to, and considered by, the full court meeting in conference to reexamine its existing procedures.

ing. I disagree. Since this is a public business that involves a real defendant in a real criminal case and goes to the essence of our appellate process, I believe that this dispute requires a public airing. Moreover, since the likelihood is great that the majority would not have published an opinion had I not contemplated a dissent, the "public airing" at least has ensured that Mr. Glover's appeal received the full attention of the court—the attention it should have received *ab initio*.

Defendant Fred Glover was charged by indictment with several offenses. The jury which heard the evidence was unable to agree on a verdict. During their deliberations, the jury sent three separate notes to the court asking various evidentiary questions and whether the jury could review portions of the transcript. The judge informed them that the transcript was not available—as it was similarly not available to this court during this appeal—that their recollections of the evidence controlled their deliberations, and that they could consider only evidence properly admitted during the trial. After approximately one full day of deliberations, the jury sent a fourth note to the court stating that it could not reach a unanimous decision, "so please advise." In response, the judge read the deadlock instructions formalized by this court in *United States v. Thomas*, 449 F.2d 1177 (D.C.Cir.1971) (en banc). That instruction announces that the jurors "have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment," that a juror must decide the case him or herself, that a juror should be willing to change his or her opinion once convinced that such opinion is erroneous, and that no juror should surrender beliefs solely because of the opinion of other jurors, or for the mere purpose of returning a verdict. *Id.* at 1184 n. 45. On the second day of deliberations, the jury submitted its fifth note and requested instructions on evidence, reasonable doubt, common sense, the facts, and the duties and responsibilities of a juror. The court then reread several general instructions and gave a second *Thomas* charge. Three hours later, the jury sent out its sixth, and final, note stating that it was still irretrievably and irreconcilably deadlocked.

Following the jury's last deadlock statement, the court announced its intention to declare a mistrial. The defendant objected to this decision, arguing that if the court instructed the jury as to the treatment of discrepancies in witness' testimony, the deadlock would be resolved. The defendant had requested this instruction when the jury previously had indicated its difficulty in reaching a verdict. The language requested by the defendant, and continuously rejected by the district court, is part of a standard instruction of the District of Columbia Criminal Jury Instructions. Instruction No. 211 (credibility of a witness).

The defendant subsequently moved to prohibit any retrial on the grounds of double jeopardy. The trial judge, in a brief three page order, held that the "classical test for lifting the double jeopardy bar to a second trial is the 'manifest necessity' standard," *see Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), and that a new trial may be ordered when the jury is genuinely deadlocked. The district court thereupon ordered a retrial, and scheduled the new trial to commence approximately sixty days after its order. Significantly, the trial judge did not explain or even refer to his refusal to give the special instructions requested by the defendant. Yet the denial of this instruction seems to be a central legal question on appeal. (Nor was this question given much consideration under the procedure used to affirm the trial judge's order.)

Defendant then filed this appeal. From the scant papers filed, the principal issue involves the double jeopardy ramifications when a court orders a new trial over defendant's objections, where that defendant has proffered a curative jury instruction. The government, in response, filed a motion for summary affirmance. The request for summary affirmance was anchored on the government's statement that "[b]ecause this interlocutory appeal is pat-

ently without merit, and because a date for retrial has already been set for December 19, 1983, we submit that summary disposition is appropriate." The majority of this panel agrees with the government and would grant summary affirmance. I dissent, not so much from that which is represented by the word "affirmance", but from that which is represented by the word "summary".

Two initial points should be noted. First, the government characterizes this appeal as interlocutory. It is clear, and the government does not suggest otherwise, that the order denying defendant's motion was a "final decision" within the meaning of 28 U.S.C. § 1291, and thus was immediately appealable. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Second, and more important, questions of double jeopardy must be resolved on a case-by-case approach. As Justice Stevens observed in his concurring statement in *Oregon v. Kennedy:* "The Court repeatedly has shunned inflexible standards in applying the ... 'manifest necessity' exception ...." 456 U.S. at 690, 102 S.Ct. at 2097. The government can cite no case of this circuit in which the precise question here presented has been decided previously. Thus, there is no binding precedent that absolutely precludes defendant's position.

As the instant case demonstrates, when this court reviews a motion for summary affirmance, the procedure is indeed summary. This appeal—unlike most appeals duly filed and docketed in this court—was given the shortest of shrifts. The government filed its ten page motion for summary affirmance on November 3, 1983. That motion, authorized by Rule 6 of this court, triggered a most truncated procedure. Under our rules, the motion may be, but need not be, accompanied by supportive points or authorities. Any response must be filed within *seven* days after the motion is served on the opposing party. Here, the defendant was given leave to file a response out of time, and in fact filed a five page memorandum on November 25, 1983, just three weeks after the government's

motion was filed. The papers then were referred to the motions panel. That panel, which convenes once a week, consists of three judges (chosen by a rotational process among the judges on the circuit), only two of whom physically meet to review the motions. At these meetings, held *in camera,* as many as ten or fifteen motions can be decided in one or two hours. Only if the two judges in attendance disagree as to the proper outcome—as they did in this case— are the papers presented to the third "tiebreaker" judge. Here, that judge voted for affirmance. Most significantly, once the motion for summary affirmance has been granted, the case has been decided *on the merits.*

My dissent stems from a firm conviction that when this court summarily decides the merits of a case through the procedure described above, its actions undermine the integrity and general principles of appellate process. As distinct from the time exigencies that always confront a trial judge and that require quick responses on the law, the appellate courts are supposed to contemplate precedents, consider the consequences of rules of law for future cases, and generally engage in the sifting and winnowing process that leads to decisions grounded on a full review of all the facts and the law as it relates to the case at hand. In a summary affirmance, the decisionmaking procedure is so accelerated that the contemplative, deliberative process must suffer. The hastened nature of a summary affirmance belies every vestige of an appeal. For example, the transcript of the trial is not yet before the court. (The one volume record that was filed in conjunction with this appeal was not before the court at the time the appeal was decided.) There are no briefs, no oral arguments, no collegiality of the decisional process. There is no time for deliberation, and very little dialogue on the merits, on the process, or on the result.

Let me state emphatically that my quarrel is not an ad hominem dispute with my two distinguished co-panelists. My dispute is with the procedure that has developed in this court, almost Topsy-like in its lack of deliberateness or concern. Let me parse

out the specific basis for my disagreement and my belief that a new procedure is warranted.

The most troublesome aspect of the summary procedure is the elimination of the pluralism that is the benchmark of the appellate process. It is true that no party has a constitutional right to appellate process in this court. Appeals, at least in this court, are completely the creature of statute—and tradition. The statute may govern the time, place, and whether of any appeal. Long tradition in the appellate courts of this country and of England has established the manner in which an appeal is treated. Statutes may modify or confirm the manner, but the fundamental character of the appellate process has largely remained unchanged. First and foremost, the process is intended to be deliberative. And, the major hallmark of that deliberative character has been judicial "pluralism". To facilitate that pluralism, appeals are to multi-member panels, which in most cases results in three judges separately considering the matter and a separate "contemplative process" for the matter. The touchstone for this pluralism is a belief that the more minds considering a matter, the better the ultimate resolution of the case is likely to be. *See generally* Leflar, *The Multi-Judge Decisional Process,* 42 Md.L.Rev. 722 (1983). I recognize, of course, that as our dockets have become more full, a need for the efficient use of judicial resources has arisen, and that this quest for efficiency on occasion must be balanced against the need for judicial pluralism.

Our use of two judges to decide a motion substantially reduces this pluralism. For a procedural or other non-dispositive motion, the need for efficient use of judicial resources usually may outweigh the need for preserving the traditional amount of pluralism. In many cases the risk to the parties may not be that substantial since the merits panel easily can correct any error. Yet, when a motion can terminate an appeal, as in this case, or otherwise directly affect the rights of the litigants, the interests of the parties are at their greatest, and the need for a cautious contemplative process should

be most keenly felt. Because the motion involves a review of the merits and can end the appeal, this is the exact situation where our decisions should reflect a most careful analysis. Our internal procedure for handling these dispositive motions thus should not be structured, as it now is, in a manner that potentially narrows judicial input and, concomitantly, may reduce the quality of our analysis. When a motion involves the merits, the balance clearly should be struck in favor of pluralism.

Moreover, there is some reason to think that the use of three-judge panels to decide dispositive motions is *required* by statute. The Federal Courts Improvement Act of 1982, 28 U.S.C. § 45 *et seq.,* may mandate that three-judge panels consider dispositive motions. This requirement would trace to a 1982 change in the statutory language from the word "division" to the word "panel", *see* 28 U.S.C. § 46(b), and an accompanying Senate Report that stated:

> Current law seems to permit appellate courts to sit in panels of less than three judges, and some courts have used panels of two judges for motions and for disposition of cases in which no oral argument is permitted because the case is classified as insubstantial. In order for the Federal system to preserve both the appearance and the reality of justice, such a practice should not become institutionalized. The disposition of an appeal should be the collective product of at least three minds.

S.Rep. No. 275, 97th Cong., 2d Sess. at 9 (1981). At a minimum, the language in the Senate Report should require us to rethink our current process for summary disposition.

Even when three judges become involved in the motions practice, the pluralism is reduced, albeit on a different level. I am troubled by the cavalier attitude toward oral argument that is implicit in the summary procedure. I realize that part of this court's procedure in non-summary dispositions allows for the preclusion of oral argument. Rule 11(d) specifically allows the court to conclude that oral arguments will not be needed. The decision to invoke Rule 11(d), however, must be made *unanimous-*

*ly* by a three-judge division of the court, in cases which are deemed frivolous, which turn on issues recently decided, or where the facts and legal arguments are adequately presented in the briefs and record. Even when those standards have been satisfied, Rule 11(d) has not met universal understanding among the members of our bar nor uniform application among members of this court. Yet, even the 11(d) standards are more protective of oral advocacy than are the standards under the current summary procedure. For example, while three judges must agree to an 11(d) motion, it takes only two judges to summarily affirm and thus to preclude oral argument. Moreover, while the panel that considers an 11(d) motion has the advantage of the briefs and record, the motions panel can eliminate oral argument without the benefit of full briefing or a trial transcript.

The summary affirmance procedure thus expands the number of situations in which the court can reach the merits of a case and yet avoid oral argument. This expansion runs counter to the concerns that have been expressed about the diminution of oral argument in the appellate process. Among those who recently have decried this movement away from oral advocacy is Justice Rehnquist, who observed that "the intangible value of oral argument is, to my mind, considerable." W. Rehnquist, *Oral Advocacy: A Disappearing Art* (October 20, 1983) (Brainerd Currie Lecture, presented at Mercer University School of Law). Justice Rehnquist commented:

> [Oral argument] is and should be valuable to counsel, to judges, and to the public. First of all, oral argument offers an opportunity for a direct exchange of ideas between court and counsel.... Second, in these days when the pressure of numbers seems to require ever greater reduction of everything into its component parts, and of those component parts into their least common denominator, oral argument serves a function over and above its usefulness in adding to the presentation of the briefs of the parties. It has the value that any public ceremony has. The lawyers, and the clients if

they are present, are brought face to face with the judges who will consider and decide their case. The judges are brought face to face with the lawyers who have written the briefs on either side.

*Id.* at 15–16. *See generally* Meador, *Toward Orality and Visibility in the Appellate Process,* 42 MD.L.REV. 733 (1983); Wosby, *The functions and importance of appellate oral argument: some views of lawyers and federal judges,* 65 JUDICATURE 340, 351–52 (February 1982). The irony of our summary disposition process is that it dispenses with oral argument by reversing the premise of appellate process: there is no oral argument unless some judge expressly pushes for it and persuades one of his colleagues to agree.

The adverse impact on the decisional process that flows from this absence of oral advocacy is exacerbated by the nonexistence of complete briefing. In the instant case, for example, the papers filed by the parties could hardly be called briefs in any recognizable sense. I am concerned, in part, because of the papers' brevity. Neither party made any effort to detail their arguments or to list all the issues that the appeal presents. Indeed, one wonders how defendant's counsel could have prepared a complete brief when he did not have the benefit of a trial transcript. I am equally concerned with the time frame under which these "briefs" must be prepared. Under Rule 6 of this court, a respondent has just seven days in which to file a responsive pleading to a motion for summary disposition.

I claim neither the experience nor the expertise to identify all the elements of the collegial deliberative process. This court's treatment of motions for summary affirmance, however, simply does not lend itself to that kind of deliberation. The absence of detailed preparation by the parties, by the individual judge with his or her chambers, together with the absence of fresh oral advocacy make it very hard to replicate the kind of deliberations that normally take place in the typical conference of a merits panel; the agenda at a motions conference frequently is long, and the absence

of any requirement to fully explain the decision by way of a written opinion—most motions are decided by brief order—increases the incentive to truncate the deliberations.

In sum, anything that looks so little like an appeal, contains so few of the accoutrements of an appeal, involves so little of the collegiality of an appeal, ought not be considered an appeal. Whatever was done to appellant in this case, he did not get an appeal from the decision of the trial judge to order a retrial.

There may indeed be proper occasions for a summary procedure. The precise setting in which such a procedure would be appropriate, however, needs to be articulated with greater precision and thoughtfulness. As a threshold matter, I believe that the standard language generally used by this court, and specifically used by the majority, is broad beyond defense. *Walker v. Washington*, 627 F.2d 541 (D.C.Cir.), *cert. denied*, 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980), states that summary affirmance is proper when the "merits of [the] claim are so clear as to justify expedited treatment." *Id.* at 545. That case sets forth no prerequisite for a time exigency, gives no clue as to how the "clearness" is to be divined, and gives no guidance as to the extent to which the motions panel should explore the merits. Most important, the case offers no explanation or suggested procedure for handling some cases on a summary basis and some through normal channels of appeal. The language in *Walker* begs a number of questions—for example, does it matter whether the case is criminal or civil? Does it matter if the appellant is pro se, as he was in *Walker v. Washington? See also Martin-Trigona v. Smith*, 712 F.2d 1421 (D.C.Cir.1983) (pro se appellant); *but see Ambach v. Bell*, 686 F.2d 974 (D.C.Cir.1982) (appellant not pro se). The *Walker* standard is so nebulous that it clearly should not stand as this circuit's preeminent statement on summary disposition. I thus cannot join in the majority's embracement and application of this standard.

This court ought to be able to develop a standard that expedites the treatment of some appeals but that still maintains the integrity of the appellate process. A starting place might be *Ambach v. Bell*, 686 F.2d 974 (D.C.Cir.1982), a case that involved a motion for summary reversal. After reciting the *Walker* standard, the court continued: "Our decision whether expedited disposition of an appeal is justified is informed not only by the utility of further briefing and argument, but also by the circumstances of the case." *Id.* at 979. Although this language is somewhat vague, one "circumstance" of paramount importance in *Ambach* was the public's interest in a speedy resolution of the litigation. The most significant aspect of *Ambach*, however, is that the court's summary disposition on the merits occurred only *after* extensive briefing and oral argument—a far cry from the summary process that the court followed in the instant case. To what extent *Ambach* should become the foundation of a new summary procedure is a question left for another day.

Clearer guidelines are necessary so that members of the bar, litigants, and indeed other judges, will know when and why the appellate process can be truncated. As the system now exists, some lawyers file motions for summary disposition almost as a matter of course; some never file and indeed may have no knowledge of the procedure. If there is to be a two-track method of processing appeals—as the result in this case would indicate—then the bar should be so informed so that all litigants could take a shot at getting the short-cut result. I would hope instead that this court would re-examine its summary disposition procedures so that such treatment can be limited to appropriate cases and, even where appropriate, can retain the essence of the appellate process. The drum-head manner in which this appeal was decided on the merits is unworthy of this great Court and its traditions.

*I dissent.*