Charles S. **FOLTZ, et al., Appellants,**

v.

**U.S. NEWS & WORLD REPORT, et al.**

No. 85–5301.

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1985.

Decided April 29, 1985.

John D. Seiver, Washington, D.C., with whom Alan Raywid, Washington, D.C., and Susan Paradise Baxter, were on the brief, for appellants.

Lawrence J. Latto, Washington, D.C., with whom William R. Galeota and Patrick M. Hanlon, Washington, D.C., were on the brief, for appellee Profit-Sharing Plan of U.S. News & World Report, Inc.

Leslie A. Nicholson, Jr., Washington, D.C., with whom Hannah E.M. Lieberman, Washington, D.C., were on the brief, for appellee U.S. News & World Report, Inc., et al.

Willis B. Snell and Steuart H. Thomsen, Washington, D.C., were on the brief, for appellee American Appraisal Associates, Inc.

Richard J. Leighton, Ralph N. Albright, Jr., Avis E. Black and Glenn P. Sugameli, Washington, D.C., were on the brief, for appellee Save The Fund.

Richard J. Wertheimer, Hadrian R. Katz and Edward L. Wolf, Washington, D.C., were on the brief, for appellees Sweet, Keker, Stone, Dunn, Tanzer, Tuohey, Naimoli & McIlhenny.

Before MIKVA and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal grows out of a class action brought by former employees of U.S. News & World Report, Inc. ("U.S. News" or "the Company") following the sale of the Company to a real estate developer and investor, Mortimer Zuckerman. The action was filed to redress what the members of the class alleged to be a gross undervaluation

of their respective ownership and profit-sharing interests in U.S. News at the time of their respective retirement or termination of employment. As the case reaches us, the former employees are seeking preliminarily to enjoin a forthcoming distribution of cash from the Profit-Sharing Plan of U.S. News ("the Plan") to current U.S. News employees on the ground that the distribution would embody a substantial overvaluation of the current employees' interests, to the irreparable damage of the class' earlier interests. In addition, and apart from the Plan's proposed distributions, the plaintiffs are requesting an order preventing U.S. News from making payments to individual defendants. The District Court denied plaintiffs' request for a preliminary injunction, whereupon the former employees appealed.

We conclude that, while injunctive relief was properly denied as to all entities and individuals save for the Plan, the District Court should now, in light of the fuller explication of the legal issues on this appeal, examine whether the former employees would lose a potential legal claim against the Plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461 (1982), were the Plan to pay out all or virtually all of its assets, and if so, whether the loss of a congressionally provided cause of action would work irreparable injury to the class.

## I

The backdrop of this dispute began with a pivotal event in 1962, when David Lawrence, the founder of U.S. News, fulfilled a long-held goal and transferred ownership of the magazine to U.S. News employees. Since that time, U.S. News has been entirely employee-owned. Under the terms and conditions of their ownership, the employees could not sell their equity interests during the course of their employment. What is more, upon leaving U.S. News' employ, the employees were required to offer their shares back to the Company at a value established pursuant to an annual appraisal conducted by an outside appraisal company. This offer was uniformly accepted by the Company and payments duly made by U.S. News to the departing employees.

By far the largest share of U.S. News stock was held in the Company's Profit-Sharing Plan, a non-contributory plan which succeeded a plan established prior to the 1962 reorganization.[1] The Plan's holdings consisted of voting shares of U.S. News, denominated Class A stock, *see supra* note 1, plus liquid assets which were employed to satisfy the claims of departing employees. The Plan was managed by a committee appointed by U.S. News' Board of Directors; members of the Board frequently served on this committee. The Class A stock held by the Plan was placed in a voting trust. Members of the Board of Directors also served as trustees of this voting trust; in addition, the principal officers of the Company served as trustees *ex officio*. Hence, a single individual within the Company's hierarchy could serve as director, officer, Plan committee member and trustee. The Plan owned its shares for the benefit of individual employee-participants. For each participating employee, an account was established with shares allocated in correspondence to his or her salary.

In addition to Class A stock held by the Plan, a smaller portion of U.S. News' capital structure consisted of bonus stock, shares of common stock nominally held by each employee individually, with similar restraints on alienation. Bonus stock was awarded at regular intervals in proportion to an employee's salary and tenure. The value of bonus stock was equal to that of the Class A shares held by the Plan.

Aside from the foregoing classes of stock, U.S. News also carried on its books what the parties have denominated "phantom stock," an obligation equivalent in value to shares of the Company but carried formally as debt rather than equity. Over

---

1. The Profit-Sharing Plan held Class A stock, which was voting stock commensurate in value with the common stock held individually by U.S. News employees.

the course of several years, the Board of Directors voted 2400 shares of such stock to several of its members and to senior executives of the firm.

## A

The main business of those who have worked at U.S. News over the years has been, of course, the publication of a well-known weekly news magazine. As fate would have it, U.S. News employees were plying their journalistic trade on a sizable tract of what was destined to become prime Washington, D.C. real estate. In 1969, this property was occupied by rather modest U.S. News offices and humble parking lots. In 1981, the modern-day urban equivalent of an oil strike occurred, with the execution of an agreement to construct two office buildings, one apartment building and a hotel on the property. The appreciation in the value of this property was, in consequence, dramatic.

The value of U.S. News' real property as reflected in the appraised value of U.S. News shares for the years 1969 to 1981 is a principal bone of contention in this litigation. As the District Court recounted the facts,[2] an independent appraiser in 1969 set a value of $6.4 million on U.S. News' real property. Approximately the same value was attributed to the property the following year in the separate annual appraisal conducted by American Appraisal Associates, Inc. ("American Appraisal"). This procedure yielded an appraised value of $65 per share of U.S. News stock.[3] From this time through 1980, the value attributed to the property fluctuated somewhat, but no fundamental change in the property's value was reported by American Appraisal. Over the same period, the appraised value of each share of stock rose gradually to $152.

At the same time, U.S. News was, not surprisingly, exploring the possibility of commercially developing this property. In 1974, zoning changes in the West End of Washington, D.C., where U.S. News was situated, measurably increased the potential for development. The Company thereupon retained a local real estate development firm to recommend development strategies; the recommendation was subsequently proffered to the Company in 1976 that all the property be developed. In 1980, U.S. News elicited advice from a leading Washington, D.C. law firm with respect to possible development. The Company also commissioned a new independent appraisal of the real estate, which concluded that the value of land owned by U.S. News had appreciated significantly since 1976.

## B

The District Court found, in light of the record as then developed, that the facts "strongly suggest[ ] that the substance of U.S. News' development activities was never submitted to" American Appraisal. *Foltz v. U.S. News & World Report, Inc.*, No. 84–0447, Memorandum Opinion at 13 (D.D.C. Mar. 28, 1985). Neither the independent appraisals nor the consultations regarding development were, the court found, disclosed to the appraisal firm. This lack of information, in the court's view, directly affected American Appraisal's annual valuation of U.S. News stock. "If the higher real estate values had been incorporated in the stock appraisals earlier, they would have had a significant impact on the value of the employees' stock interests." *Id.* at 14.

In 1981, U.S. News entered into a joint venture to develop its property. The appraised value of U.S. News stock then tripled that year, to a previously unknown

---

**2.** No ultimate findings of fact have, of course, been reached at this pre-trial stage. In consequence, our reference to the facts are those as found preliminarily by the District Court based upon the record before it at the time of its ruling. In no wise should our discussion of the facts be deemed final at this early stage where trial has yet to be held.

**3.** For convenience of reference, "U.S. News stock" is referred to generically. Suffice it to say that the Class A stock, the common stock (or "bonus stock") and the so-called phantom stock were all equivalent in value.

level of $470 per share. As development plans proceeded, the Board of Directors decided to sell the Company. U.S. News' partner in the development program, Mortimer Zuckerman, offered approximately $2800 a share for the Company, an offer that the Board and the employees found impossible to refuse.

The result of all this was that Mr. Zuckerman, the successful bidder for U.S. News, paid, in effect, $135 million for the Class A shares held by the Plan, $19 million for the bonus shares owned individually by employees, $13 million for the phantom shares and $10 million as a contingency fund for damages awarded in any litigation arising out of the sale. The Plan exchanged its shares for cash and is now holding those funds in anticipation of effecting a distribution to the 505 current U.S. News employees. Those present employees have, of course, already received cash for their bonus shares. Compensation for the phantom shares is being paid out over a fifteen-year period in quarterly installments by the Company as a corporate obligation. The new owner, in turn, has since assumed control of U.S. News.

### C

As these foregoing developments began to unfold, it became readily apparent to the magazine's former employees that their successors, U.S. News' current employees, would receive far more per share than they had themselves enjoyed when they left the Company. The situation was, in brief, that the former employees received an average of approximately $100 per share at the time of their departure from the magazine; in contrast to what in hindsight was a modest price per share, the 505 current employees were by virtue of the sale to Mr. Zuckerman to receive approximately $2800 per share. In February 1984, four former employees filed suit in federal district court; in September 1984, the District Court certified a plaintiff class under Fed. R.Civ.P. 23(b)(3). The class consists of 230 former employees of U.S. News who left the Company between 1974 and 1981.

The original complaint named as defendants U.S. News, its real estate subsidiary, and four directors of the Company. American Appraisal and other individuals were added as defendants in amended complaints. The current employees of U.S. News, who were looking forward to sizable cash distributions, formed a group christened "Save the Fund," which was permitted by the District Court to intervene in the action. The Profit-Sharing Plan was named as a defendant only in another amended complaint, filed nine months after the litigation began. As variously amended, the complaint charges the defendants with fraud, fraudulent concealment, breach of fiduciary duty, negligence, and violations of the federal securities laws, antitrust laws and the Employee Retirement Income Security Act. The sole claim advanced against the Plan arises under a specific provision of ERISA, 29 U.S.C. § 1132 (1982). The gravamen of the complaint is that through various means, not the least of which was the annual appraisal of U.S. News' real estate, the value of the prior employees' stock interests was substantially depressed below actual fair market value.

In August 1984, before the Plan was joined as a defendant, the former employees sought an injunction prohibiting distribution of the proceeds of the sale of U.S. News. The District Court denied the injunction at that time, but ordered that prior notice of any proposed distribution be provided. In January 1985, in compliance with the District Court's ruling, the Plan gave notice of its intention to distribute its assets to current plan participants, whereupon the former employees renewed their motion for a preliminary injunction. The District Court denied the motion, and the former employees appealed. This court ordered the case expedited and set the appeal for oral argument on April 17, 1985. Absent an order to the contrary, the Plan intends to distribute its assets on or after May 31, 1985.

### II

The question of who will reap the fruits of the 1984 sale of U.S. News to Mr. Zuck-

erman lies at the center of the litigation pending below. We address only one skirmish on appeal, albeit an important one. We are considerably aided in our task by the District Court's comprehensive opinion setting forth its reasons for refusing to enjoin distribution of the proceeds of the sale of U.S. News. It is to that opinion that we now turn.

The District Court began, appropriately, by canvassing the well-established factors governing the issuance of a preliminary injunction: the movant's likelihood of success on the merits; the possibility that the movant will suffer irreparable injury in the absence of equitable relief; the possibility that granting relief will induce injury to other parties; and the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir.1958). The District Court, in brief, divined no irreparable injury flowing to the former employees were injunctive relief to be denied, and on the other hand foresaw substantial injury to the 505 current employees of U.S. News were such relief to be granted.

In the District Court's view, the former employees had adduced what the court termed an "intriguing" case on the merits. Memorandum Opinion at 17. The court concluded that serious questions had been raised as to compliance with ERISA and that a "colorable claim" had been presented that some of the defendants had run afoul of that statute. *Id.* at 26, 28. The court perceived inattention on the part of some defendants, as reflected in the annual appraisals, to the substantial possibility of significant real estate development and found that fact "disturbing." *Id.* The District Court also opined that serious questions had been raised concerning a practice by American Appraisal to discount the value of U.S. News shares for want of a ready

market, a so-called marketability discount. *Id.* at 29. The court seemed to conclude that the former employees had demonstrated sufficient likelihood of success on the merits to justify preliminary relief if irreparable injury were shown.[4]

As to this latter factor, however, the court determined that the facts as elicited thus far in the case favored the defendants. A preliminary injunction would, in the court's view, have the effect of preserving a pool of assets from which the former employees could subsequently recover. The District Court characterized such an intervention by equity as "disturb[ing] the status quo." *Id.* at 18. In the District Court's view, judicially ordering the withholding of payments to the current employees was functionally equivalent to allowing the former employees to recover damages prior to trial, inasmuch as the same injury would be visited upon the current employees in either situation. *Id.* at 20.

The court observed that the elements of a previous determination of liability and the imminence of serious irreparable injury, two considerations found to justify preliminary relief in this court's decision in *Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C.Cir. 1984), were not present in the circumstances at hand. The court further added that the instant case did not involve a situation where assets necessary to satisfy a future judgment were about to be removed beyond judicial reach, *see USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir.1982); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683 (5th Cir.1980); *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); or about to be dissipated, *see Lynch Corp. v. Omaha National Bank*, 666 F.2d 1208 (8th Cir. 1981); *Iowa Center Associates v. Watson*, 456 F.Supp. 1108 (N.D.Ill.1978); *Mutual Benefit Life Insurance Co. v. Atlas Fi-*

---

**4.** Specifically, the court stated in this respect: "Had the plaintiffs made the requisite showing of irreparable harm, the Court would have been

inclined to grant them some relief on the basis of this claim." Memorandum Opinion at 25.

*nancial Corp.*, 320 F.Supp. 93, 96 (E.D.Pa. 1970), *aff'd*, 454 F.2d 278 (3d Cir.1972).

After canvassing the relevant case law, the District Court concluded that "[a]t a minimum, [the former employees] must show that the substantial assets of the individual and corporate defendants would be insufficient or unavailable to satisfy a judgment." Memorandum Opinion at 23. The court then enumerated several potential sources for recovery by the former employees were they ultimately to prevail: the $10 million litigation fund established by U.S. News; $50 million in liability insurance carried by American Appraisal; $29 million due to the individual defendants in exchange for their shares of U.S. News stock; and, finally, $5 million in liability insurance carried by the individual defendants. The court found no evidence whatever that U.S. News or American Appraisal were judgment-proof, or that the individual defendants would transfer their not inconsiderable resources outside the jurisdiction. Hence, as the District Court saw it, no real danger was lurking that a judgment in favor of the former employees, which they estimated at between $73.6 million and $97.8 million, would go unsatisfied. In consequence, the court held no irreparable injury could be established by the class. *Id.* at 23–24.

The court went on to conclude that issuing an injunction would harm the current employees, by virtue of the obvious fact that they would thereby be denied the sale proceeds for a time and, in addition, might well lose certain tax advantages by postponement of the scheduled distribution. The District Court weighed heavily this factor of burden to current employees, inasmuch as the "overwhelming majority" of current employees were "completely innocent of any wrongdoing." *Id.* at 30. Finally, the court did not identify in a specific manner any way in which the relief sought implicated the public interest.

As a result, with its focus upon the absence of irreparable injury to the former employees of U.S. News if the preliminary injunction were denied, and injury to the

Company's current employees if the injunction were granted, the District Court denied relief.

## III

The standard of review on appeal from the granting or denial of a preliminary injunction has been fully elucidated in the prior decisions of this court. It is sufficient here simply to reiterate the synthesis found in *Ambach v. Bell*, 686 F.2d 974 (D.C.Cir.1982):

> It is well settled that whether a preliminary injunction shall be awarded rests in the sound discretion of the trial court.... This court will not ordinarily disturb the order of the District Court granting or denying a preliminary injunction except for abuse of discretion or clear error.... If our review of the trial court's action reveals that it rests on an erroneous premise as to the pertinent law, however, we must examine the decision in light of the legal principles we believe proper and sound.... In that event, "[t]he reversal of the trial judge in no way reflects a determination that he was unreasonable or arbitrary, or chargeable with an abuse of discretion, but only and simply that his premise as to the applicable rule of law is deemed erroneous by the appellate court."

*Id.* at 979 (citations omitted), *quoting Delaware & Hudson Ry. v. United Transportation Union*, 450 F.2d 603, 620–21 (D.C. Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

■ Applying those well-settled principles, we have no hesitation in affirming that part of the District Court's order refusing to enjoin the quarterly installment payments by U.S. News to former possessors of the phantom stock. The form of payment itself, extended over a fifteen-year period, guarantees that the vast majority of this fund will remain available to satisfy any future judgment. Even if this were not true, no showing has been made that these assets will either be transferred beyond the court's reach or dissipated. Hence, there will be no irreparable injury

resulting from denial of a preliminary injunction against U.S. News.

██ We come now to the question whether injunctive relief *pendente lite* can and should lie against the Plan itself. We do not today definitively answer those questions. Instead, we, more narrowly, vacate in part the District Court's order and remand for further consideration as to whether such relief can and should be conferred in light of the totality of the circumstances appropriately to be considered by the District Court.

We begin in this respect by observing that the nettlesome legal question as to the availability, under the circumstances as alleged here, of monetary recovery from the Plan itself was not as sharply focused upon by the parties in the court below as it has subsequently been on this appeal. It is thus not surprising that, as the litigation was shaped by the parties, the District Court did not expressly address the issue of the Plan's liability *vel non* under the plaintiff class' theory as now articulated on appeal. For one thing, as we have already seen, the Plan was not initially named as a defendant when this action was filed in February 1984. Nor was the Plan added with the filing of the first or second complaints. Indeed, it was not until nine months after this suit began, in November 1984, that the Plan itself was first haled into court.

But that is not all. The gravamen of the complaint in this case is, as we have seen, that a variety of enumerated acts of alleged wrongdoing by various defendants resulted in a substantial and unlawful depression of the value of the plaintiffs' respective interests in the Plan. That theory fits most logically within the concept of breach of fiduciary duty, which for purposes of ERISA is directly subject to redress under section 409 of that statute, 29 U.S.C. § 1109(a) (1982). It is another, quite

separate step for plaintiffs now to assert that their loss—the alleged underpayment of benefits—works a separate violation of another provision of ERISA by the Plan itself for the withholding of "benefits due" to a group of prior participants.

On appeal, plaintiffs vigorously assert that a distribution of assets, followed by a winding down and dissolution of the Plan, will eradicate a cause of action granted by ERISA against the Plan for "benefits due" under section 502 of the statute. 29 U.S.C. § 1132(a)(1)(B) (1982). Plaintiffs contend that once distribution is effected, little if any likelihood would exist of recovering any amounts paid by the Plan.[5] In view of the magnitude of the class members' current estimates of their possible recovery, they look on the prospect of a distribution of Plan assets with considerable foreboding. Their disquiet is reinforced by what they perceive as an inevitable "run" on the Plan, as it were, by current beneficiaries who will undoubtedly seek immediately to secure the sizable amounts awaiting them, especially in view of the spectre of uncertainty generated by this litigation.

On the other side, the Plan senses in plaintiffs' manueverings an ill-founded effort to embroil a guiltless entity into an ever-widening legal battleground. As the Plan sees it, the plaintiffs' claim lies against only those, if any, who breached their fiduciary duty. Plaintiffs' legal theory in respect of the Plan's potential liability is, in the Plan's view, unorthodox, unsupported by legal authority, and contrary to ERISA's plain language. The pertinent statute, the Plan suggests, confers a right of action on a beneficiary vis-a-vis a statutorily covered plan only "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B) (1982). Here, whatever the Plan corpus would have been but for the alleged breaches of fiduciary duty, the plaintiff class members were paid, the Plan maintains, in precise

---

5. Under section 502, "[a]ny money judgment ... against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is estab-

lished in his individual capacity...." 29 U.S.C. § 1132(d)(2) (1982). No party has suggested to date that a claim would lie against innocent current employees receiving distributions from the Plan.

accordance with the terms of the Plan instrument itself, *i.e.,* in accordance with the annual appraisals. The benefits due were simply those owing under the terms of the Plan document, nothing more, nothing less. If, the Plan concludes, the appraisals which determined the precise amount of benefits paid over the years to the class members were improperly depressed by virtue of fraudulent or illegal conduct, then it is the wrongdoers who must pay. The Plan itself, the argument further runs, should not be saddled with the results of alleged wrongdoing by fiduciaries, most especially when, as the plaintiffs themselves see it, the fiduciaries enriched themselves at the expense of departing Plan participants.

These contesting positions do not yield for us, in the space of an extraordinary equitable proceeding handled in expedited fashion, an immediate, definitive answer as to the Plan's potential liability under ERISA. Accordingly, we expressly decline to seek in such haste to divine an authoritative answer to what appear to be novel questions in the labyrinthine complexities of ERISA law and practice.[6] But what we are left with, more modestly, is the firm conviction that plaintiffs have now *articulated* a clear theory of liability as against

the Plan under section 502 of ERISA. Whatever its merit, the theory is now, with the fuller unfolding of the litigation and the expedited briefing before us, plainly enunciated; that theory now merits considered examination in the first instance by the District Court.[7]

What is more, plaintiffs persuasively maintain that any cause of action against the Plan under ERISA would effectively be lost by the Plan's paying out the lion's share—if not all—of its current assets, and most emphatically so if the Plan then proceeds promptly to wind up its affairs and effectuate its own dissolution as an entity. In that event, it is clear beyond cavil that any cause of action under ERISA against the Plan "as an entity," in the words of the statute, would forever be lost. Irrevocable loss of a cause of action created by Congress for the remedial and humane purpose of protecting beneficiaries and participants of ERISA-covered plans could, in our judgment, well work irreparable injury warranting the fashioning of equitable relief under the well-settled standards articulated by this court.[8] *Friends For All Children, Inc. v. Lockheed Aircraft Corp., supra; Ambach v. Bell, supra; Jacksonville Port Authority v. Adams,* 556 F.2d 52 (D.C.Cir.

**6.** Plaintiffs rely, for example, extensively upon a decision of the Ninth Circuit Court of Appeals, *Russell v. Massachusetts Mutual Life Insurance Co.,* 722 F.2d 482 (9th Cir.1983); the Supreme Court, however, granted certiorari in that case, —— U.S. ——, 105 S.Ct. 81, 83 L.Ed.2d 29 (1984), heard argument in January 1985 and heard reargument only the other day, on April 24, 1985.

**7.** This is not to say that the District Court must reach at this juncture a final conclusion as to the interplay between the ERISA section concerning breach of fiduciary duty, 29 U.S.C. § 1109(a), and the subsequent section pertaining to an action against a covered plan for benefits due, 29 U.S.C. § 1132(a)(1)(B). For purposes of injunctive-relief analysis, the court will be called upon to determine whether plaintiffs have demonstrated a substantial likelihood of success on the merits. If, moreover, the court finds on remand that irreparable injury would occur, then the more modest question for resolution is whether the plaintiffs have raised a serious legal question in this respect.

**8.** This assumes, of course, that weighing of the other factors in consideration of entitlement to

equitable relief warranted, under settled principles, the fashioning of such relief. In its Memorandum Opinion, the District Court determined, among other things, that the element of irreparable injury was not made out since creditworthy defendants, other than the Plan, could satisfy any judgment that might be entered in favor of the plaintiff class. We are constrained to disagree with this portion of the District Court's analysis. It simply cannot be assumed that, if plaintiffs' claims have merit, all named defendants would be held liable, nor that their respective resources could be added up to satisfy the plaintiffs' total damages claim. It is too soon to tell which, if any, of plaintiffs' claims will prevail and against whom. The possibilities, being legion, are simply too varied. For example, it is possible that only a minority of defendants will have the issue of liability determined adversely to them, thus leaving other defendants entirely vindicated. Hence, we cannot agree that arithmetical aggregation of varying abilities to pay will suffice for purposes of irreparable-harm analysis.

1977). Whatever the creditworthiness of other named defendants, it would do violence to Congress' intent in carefully framing an arsenal of remedial legal weapons in this watershed statute not to preserve the *status quo* to the extent of keeping alive an otherwise viable, statutorily provided cause of action. *See Eaves v. Penn,* 587 F.2d 453, 457 (10th Cir.1978); *Connolly v. Pension Guaranty Corp.,* 581 F.2d 729, 731–32 (9th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

The affording of such remedial relief would not run afoul of the well-settled principle of equity that monetary relief is not to be awarded in a money damages case prior to a determination of both liability and the extent of damages. *See Sims v. Stuart,* 291 Fed. 707 (S.D.N.Y.1922). As this litigation presently stands, there has been, of course, no determination of liability, *compare Friends For All Children, Inc. v. Lockheed Aircraft Corp., supra;* quite to the contrary, liability is vigorously contested by all defendants to this action. Notwithstanding that factor, an equitable remedy designed to freeze the *status quo,* as opposed to creating a pool of resources from which members of the plaintiff class could draw prior to a determination of liability and the extent, if any, of damages, would be entirely in keeping with the principles that undergird equity jurisprudence. In consequence, as a conceptual matter, we are convinced that fashioning an equitable remedy—as against the Plan—carefully crafted in light of the entire set of circumstances before the trial court would not, in theory, be improper.

This is, emphatically, not to say that injunctive relief should in fact be afforded against the Plan. We make no such determination. To the contrary, we leave that question for the District Court to determine expeditiously on remand, in light of the full set of facts and circumstances as they now exist and continue to unfold. For the District Court's guidance, we now identify the considerations that, at this stage, we deem pertinent in the inquiry that lies ahead.

As an initial matter, it is not at all clear, as appellants urged before us, that the Plan will in the immediate future cease to exist as an entity. The precise intentions of the responsible Plan officials in this respect are obviously of pivotal importance. We observe, however, that counsel to the Plan has represented to us, *first,* that no distributions will be effected prior to May 31, 1985; and *second,* that the Plan will likely remain in existence after the distributions to participants are fully effected since the Plan would receive (for subsequent distribution to current Plan participants) part of the $10 million contingency fund not expended by virtue of pending litigation, including this lawsuit. Hence, at least as of April 17, 1985, when this case was argued, it was by no means clear that dissolution of the Plan was imminent.

Plaintiffs would, nonetheless, have a hollow victory indeed if the Plan remained extant, as a formal matter, but was drained of all or virtually all of its assets, especially if the plaintiffs' damages claims against the Plan itself (as opposed to any claims directed at the other defendants) were far in excess of any remaining assets. Accordingly, another factor to be taken into account by the District Court on remand is the amount of damages which, if a cause of action were found to lie against the Plan, could realistically be sought and recovered against the Plan itself.

We begin in this connection with what should admit of no reasonable dispute, namely that the maximum amounts represented by the plaintiffs to be claimed in this litigation are considerably lower than the total assets of the Plan. We are informed that the present value of the Plan's assets is approximately $140 million. The amount claimed by plaintiffs, in their representations to this court, ranges from $73.6 to $97.8 million, not including their claim for punitive damages. Appellants' Brief at 8 n. 7 (based upon affidavits of Messrs. Hempstead and Hatch). Surely, however, a punitive damages claim would lie only against the alleged wrongdoers, not the Plan itself. Thus, a very substantial sum

should be available promptly for distribution to current Plan participants even under the most generous view of plaintiffs' case.

More narrowly, in the shaping of any specific relief, the District Court will be called upon to evaluate the likely extent of damages which might eventually be recovered were plaintiffs to prevail at trial. The parties are, not surprisingly, in sharp dispute as to the likely amount of any monetary recovery by the class were this action to succeed. Whereas the class suggests that it has prudently crafted its current estimates of damages, various defendants, including the Plan, respond that the damages claims are wildly inflated. The issues in dispute concerning damages, at least as they affect the Plan, include at a minimum: (1) whether and to what extent damages claims would lie against other defendants in the action but not against the Plan; (2) whether prejudgment interest claims can appropriately and lawfully lie against the Plan under any circumstances; and (3) whether the contingency fund of $10 million, established in connection with the acquisition of U.S. News, would be available to discharge any liability imposed upon the Plan in the course of this litigation and, if so, whether the amount in the fund would

likely be adequate to protect the class' interests.

\*   \*   \*   \*   \*   \*

The preceding discussion is by no means intended to delimit the scope of the District Court's inquiry on remand. We leave to the sound discretion of the trial judge the scope of the precise factual inquiry to be undertaken. We, again, decline to speculate in advance of that further inquiry whether injunctive relief *should* in fact be afforded against the Plan. We decide today only that a claim for such relief could, depending upon the facts yet to be fully developed and legal conclusions yet to be drawn, appropriately lie, if that relief is fashioned narrowly, consistent with the traditions of equity, to meet the precise situation as it then exists before the District Court.

*Affirmed in part; vacated in part, and remanded.*