**ESTATE OF Ben GRANT, Plaintiff,**

v.

**U.S. NEWS & WORLD REPORT, INC., et al., Defendants.**

Civ. A. No. 86–0156.

United States District Court,
District of Columbia.

June 12, 1986.

As Amended June 13, 1986.

Order July 2, 1986.

cedure.

David H. Cox, Jackson R. Campbell, P.C., Washington, D.C., for plaintiff.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Thomas J. Catliota, Jonathan T. Cain, Washington, D.C., for U.S. News, Madana Realty.

Lawrence Latto, William Galeota, Julie Melamud, Shea & Gardner, Washington, D.C., for Profit-Sharing Plan.

Richard J. Wertheimer, Hadrian Katz, Edward Wolf, Washington, D.C., for Directors.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

This proceeding is brought on behalf of Ben Grant, deceased, a former employee of U.S. News & World Report, Inc. ("U.S. News" or "Company"). Plaintiff Estate asserts in a multi-count complaint various federal and pendent common-law claims against five defendants, arising from Grant's former employment with U.S. News. Named as defendants are U.S. News; John Sweet, a former member of its Board of Directors; the U.S. News Profit-Sharing Plan ("the Plan"); the Madana Realty Company ("Madana"), a wholly-owned subsidiary of U.S. News; and American Appraisal Associates, Inc. ("American Appraisal"), an independent appraisal firm.[1] The gravamen of the charges against the defendants is that they were responsible for a deliberate undervaluation of the Company's assets and stock, which in turn resulted in an undervaluation of retirement benefits due Grant upon his separation from U.S. News.

Mr. Grant died in 1982. His interests are represented by his widow, Elizabeth B. Grant, who has obtained the requisite authority from the appropriate court allowing her to undertake this suit on behalf of his estate. The Grant Estate was formerly a plaintiff in the class action suit brought in February 1984 by employees who left the Company between 1974 and 1981 and who similarly claim that their retirement benefits were undervalued. *Charles S. Foltz, et al. v. U.S. News & World Report, Inc., et al.*, C.A. No. 84–0447.[2] However, in 1985 the Estate, along with three other former members of the Board of Directors, was excluded from membership in the class, with leave to proceed separately. The Court concluded that the directors had interests which differed from and possibly conflicted with those of the remaining members of the class which included only former employees. Plaintiff Estate filed the complaint in this proceeding on January 17, 1986, later amended in February 1986. This case was consolidated on March 3,

---

1. While named as a defendant, the complaint does not allege any cause of action or assert any claims for relief against Madana apart from those asserted against U.S. News.

2. The named defendants in *Foltz* are U.S. News, American Appraisal, the Profit-Sharing Plan, and former members of the U.S. News Board of Directors.

1986 with the ongoing *Foltz* class action suit and a third proceeding, *David B. Richardson, et al. v. U.S. News & World Report, Inc., et al.*, C.A. No. 85–2195, a suit brought by former employees who left U.S. News in 1982.

Read in light of this Court's ruling on defendants' motions for summary judgment in *Foltz*, 627 F.Supp. 1143 (1986), and the Order consolidating the proceedings, the Estate's amended complaint charges defendants U.S. News, John Sweet variously with violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.-10b–5; Section 404(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104(a), as enforced by section 502(a)(3), 29 U.S.C. § 1132(a)(3); and with the commission of common-law fraud. U.S. News and Sweet are also charged with unjust enrichment, negligence and negligent misrepresentation. Against the Profit-Sharing Plan, plaintiff asserts a claim for benefits due under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

This proceeding is presently before the Court on defendants' motion for summary judgment. While defendants invoke several defenses, they rely chiefly upon the argument that the Estate's claims are time-barred. The parties have completed exhaustive discovery. Their supporting affidavits, appendices to statements and counter-statements of material facts not in dispute, legal memoranda and arguments of counsel have been fully considered. Because the Court agrees that the controlling statutes of limitations bar plaintiff's cause of action as a matter of law, the Court does not reach defendants' other arguments but grants their motion on limitations grounds. The Estate's complaint is dismissed with

prejudice. The reasons for that determination are set out below.

## I. BACKGROUND

### A.

Over the course of his employment, Grant served in several responsible posts of U.S. News including that of Supervising Editor, Associate Editor, and later Managing Editor. Beginning on January 1, 1970, he transferred from the news department to the corporate management department of the Company, where he served as Executive Vice President and as a member of the Board of Directors for five years ending December 31, 1974.

During the years Mr. Grant served as Managing Editor of U.S. News, he frequently wrote on matters relating to business and corporate matters.[3] As Executive Vice President, he was authorized to serve as acting Chief Executive Officer in the event of any temporary vacancy in that position. While a member of the Board of Directors, he served on its Investment Committee, whose function was to oversee management of the Company's pension plan and the investments of the Profit-Sharing Plan. At the same time that Grant served on the U.S. News Board, he also served as a member of the Board of Directors, and as a vice president of Madana Realty Company for 20 months from mid-March 1973 to December 31, 1974. Madana oversaw the Company's extensive and potentially valuable real estate holdings in the West End of Washington, D.C., which are central to the subject matter of these consolidated lawsuits.

Upon retirement in December 1974, Mr. Grant resold to the Company 2,400 shares of common stock that he owned, as required by the U.S. News Articles of Incorporation.[4] In addition, he liquidated his account with and received his profit-shar-

---

3. Declaration of Samuel J. Keker, April 6, 1986, ¶ 3, submitted with motion of defendants for summary judgment filed April 7, 1986.

4. The purpose behind the resale provision of the Articles was to maintain the character of the

Company as an entirely employee-owned business. The shares were non-transferable and redeemable at U.S. News' option upon an employee's retirement or separation.

ing benefits from the Plan. As a member of the Plan, Mr. Grant had acquired an undivided interest in its assets according to a formula based upon his salary and tenure at U.S. News. The principal asset of the Plan consisted of a block of 50,000 shares of the U.S. News Class A stock. The price which Grant received for his shares of common stock and which established the value of his Plan account was determined by an independent appraisal of the value of the Company's closely held stock,[5] undertaken by defendant American Appraisal.

### B.

In 1984, U.S. News, along with its interest in the real estate holdings, was sold to Mortimer Zuckerman, a real estate and publishing entrepreneur. Earlier, in 1981, a series of joint ventures for purposes of developing the real estate was entered into between U.S. News and a Zuckerman concern, Boston Properties, Inc.[6] In acquiring U.S. News, Mr. Zuckerman paid approximately $2,800 per share of stock, or roughly $176 million. Ten years earlier, when Mr. Grant retired, the stock was appraised at only $65 per share. Accordingly, his Estate, together with the *Foltz* and *Richardson* plaintiffs,[7] charges that U.S. News, acting in concert with American Appraisal, intentionally depressed the value of its stock, and hence of his retirement benefits, principally by not reflecting in the appraisals of the stock the full value of the Company's real estate holdings and the control premium that he asserts should have been attributed to the 50,000 shares of Class A stock held by the Plan.

### II. ANALYSIS

Because the Grant Estate now brings a claim based upon events occurring no later than January 1975, when Grant's retirement benefits were disbursed, defendants maintain that the instant suit is time-barred. Even if the running of the statute of limitations were tolled during the pendency of Grant's participation in the *Foltz* class action, the defendants point out, the time for filing has long since passed. Plaintiff counters by asserting that the nature of defendants' acts require that the statute be tolled under the doctrine of fraudulent concealment, a claim advanced with more or less success by the *Foltz* plaintiffs in response to defendants' motions for summary judgment in that suit.[8] Yet because Mr. Grant held several senior management positions in the last five years immediately preceding his retirement, the defendants urge that he had ready access to, and had the means and the opportunity to discover, relevant information that would preclude either him or his estate from relying upon equitable tolling of the statute of limitations. In sum, defendants assert that, as a matter of law, Grant's official status rendered it unreasonable for him to fail to pursue his claims in a timely fashion and that, therefore, summary judgment is warranted.

### A.

#### *Relevant Statutes of Limitations*

The present complaint advances claims under federal securities law and ERISA, as well as various common-law claims. Accordingly, an analysis of the relevant statutes of limitations as they relate to each claim is appropriate.

#### 1. *Federal Securities Law Claims*

██ The applicable limitations period for plaintiff's securities claims is two years.

---

5. Such an appraisal was undertaken each year, as provided under Article Fifth of the U.S. News Articles of Incorporation.

6. According to the terms of these joint ventures, U.S. News assigned its real estate to Boston Properties, in exchange for a 50 percent equity interest in the future income from the ventures.

7. For a fuller account of the background of this litigation, see this Court's prior opinions at 627 F.Supp. 1143 (1986); 613 F.Supp. 634 (1985) and 608 F.Supp. 1332 (1985), as well as that of the Court of Appeals, 760 F.2d 1300 (D.C.Cir. 1985).

8. *Foltz v. U.S. News & World Report, Inc.*, 627 F.Supp. 1143, 1149–56 (D.D.C.1986).

*See Wachovia Bank & Trust Co. v. National Student Mkt'g Corp.*, 650 F.2d 342, 346–48 (D.C.Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981) (applying the limitations period of D.C.Code Ann. § 2–2413(e)).

### 2. *ERISA Claim For Benefits Due— § 502(a)(1)(B)*

█ Because ERISA provides for no specific statute of limitations for a claim for benefits due under section 502(a)(1)(B), a court is required to borrow a limitations period from the most closely analogous state cause of action. *E.g., Jenkins v. Local 705, Int'l Bhd. of Teamsters Pension Plan,* 713 F.2d 247, 251 (7th Cir.1983). Courts have generally likened a claim for benefits due to a suit on a contract, typically a contract between employer and employee. *Id.* at 252; *accord Ferguson v. Greyhound Ret. and Disab. Trust,* 613 F.Supp. 323, 324 (W.D.Pa.1985); *Dameron v. Sinai Hosp. of Baltimore, Inc.,* 595 F.Supp. 1404, 1413 (D.Md.1984). Such was also the reasoning of this Court in *Foltz* in applying the three year limitations period provided for contract actions in the District of Columbia, D.C.Code Ann. § 12–301(7) (Michie 1981). 627 F.Supp. at 1149 n. 5.

Plaintiff, however, presents a theory not previously advanced by any other claimant in these consolidated proceedings, specifically, that the 12 year limitations period applicable to contracts under seal, D.C. Code Ann. § 12–301(6), and not the three year period for simple contracts, should govern a section 502(a)(1)(B) claim. Plaintiff Estate maintains that the Articles of Incorporation of the Company, which are apparently under seal, represent the relevant instrument. Defendants counter that the Plan Document, instead, embodies the relevant "contract," if any. While it is true that the Articles provide for the beneficial ownership of the Company's stock by its employees, it is the Plan Document that provides the operative terms of the Plan, including the rights of its participants and the duties of its administrators and of U.S. News as contributor. To that extent, de-

fendants appear correct in looking to the Plan Document as the controlling instrument.

The question then arises of whether the Plan Document is an instrument under seal. Although the signers recite that the corporate seal of U.S. News was to be affixed, the document does not actually bear a seal or any substitute therefor. And since "[i]t is the attachment or adoption of a seal that is the operative fact," not any recitation that the document is under seal, that creates a sealed instrument, *Vaccaro v. Andresen,* 201 A.2d 26, 28 (D.C.1964); *see also Monroe Park v. Metropolitan Life Ins. Co.,* 457 A.2d 734, 736 n. 5 (Del.1983), defendants maintain that the Plan Document is not in fact a sealed instrument. Even assuming the corporate seal were affixed, they point out that the Plan Document would not necessarily be rendered an instrument under seal, unless the execution of a sealed instrument were clearly intended by the parties, citing *Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.,* 452 F.2d 1346, 1357 n. 68 (D.C.Cir.1971). Otherwise, the corporate seal will only be seen as a mark of genuineness. *Id.*

█ That the Plan Document is a proper instrument under seal is at best doubtful. And even if it were a sealed instrument, there is great difficulty in applying a 12 year limitations period to the present claim. The ERISA is a creature of federal law, designed to promote uniformity in the administration of employee benefit plans. 120 Cong.Rec. 29933, 29934, 29942 (1974) (remarks of Sen. Javits); *see also* H.R. Conf.Rep. No. 1280, 93d Cong., 2d Sess. 327 (1974), U.S.Code Cong. & Admin.News 1974, pp. 4639, 5106. It would be incongruous, then, if the limitations period applicable to one of its key enforcement provisions were to vary widely, not only from state to state, but within a state, depending upon whether the operative plan instrument were executed with the appropriate "magic words" or symbols. While it is true that Congress left it to the courts to apply an appropriate limitations period to claims for

benefits due, it could not have intended that a court should borrow, as the occasion arose, from one of the most anachronistic provisions of state law. Plaintiff's theory, if accepted, would frustrate the intent of Congress to create uniformity in the enforcement of rights under employee benefit plans.

Accordingly, and consistent with its earlier opinion, the Court rejects plaintiff's argument and rules that the applicable limitations period for a claim under ERISA § 502(a)(1)(B) is three years, as provided for by D.C.Code Ann. § 12–301(7).

### 3. ERISA Claim for Breach of Fiduciary Duty—§ 502(a)(3)

■ For a claim for breach of fiduciary duty, ERISA provides a six year limitations period, which will be reduced to three years if the plaintiff had actual notice of facts underlying the wrongs alleged. 29 U.S.C. § 1113. Because the Court holds below that Grant was on actual notice of the facts underlying plaintiff's suit, a three year limitations period applies to its claims under section 502(a)(3).

### 4. Common-Law Claims

■ The limitations period applicable to plaintiff's common-law claims is three years. D.C.Code Ann. § 12–301(8).

In sum, the longest limitations period applicable to any of plaintiff's claims is three years, considerably less time than the 10 or so years that have elapsed since Mr. Grant's retirement from U.S. News.

### B.

### Doctrine of Fraudulent Concealment

■ The legal elements of a claim that a cause of action has been fraudulently concealed are well established in this Circuit. To prevail on such a claim, a plaintiff must demonstrate that (1) the defendant engaged in some fraudulent or deceptive course of conduct that successfully concealed facts underlying his cause of action, (2) he was not on notice of those facts, (3) despite the exercise of due diligence. *Hob-*

*son v. Wilson,* 737 F.2d 1, 33–36 (D.C.Cir. 1984), *cert. denied sub nom. Brennan v. Hobson,* —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). In its most recent pronouncement concerning the doctrine of fraudulent concealment, the D.C. Circuit reaffirmed the vitality of the due diligence requirement. *Hohri v. United States,* 782 F.2d 227, 246–50 (D.C.Cir.1986). In *Hohri,* the Court stressed that, once a potential plaintiff is put on notice of facts indicating that "further inquiries might be appropriate[,]" he comes under a duty "to discover that which was concealed...." *Id.* at 250. In other words, a potential plaintiff "is held to be on notice of all facts he could have learned through reasonably diligent inquiry." *Hobson,* 737 F.2d at 35 n. 107, *cited in Hohri,* 782 F.2d at 250. In short, the absence of actual notice is not sufficient to prevail on a claim for fraudulent concealment; such a claim will be defeated if a plaintiff *should have known* of facts underlying his cause of action.

### C.

### Application of the Doctrine to the Facts of Record

In an attempt to come within the parameters of the fraudulent concealment doctrine, plaintiff essentially focuses not upon whether Mr. Grant had constructive knowledge of facts relating to the wrongs alleged, but whether he actually knew of those facts. In this way, plaintiff misconstrues and misapplies the tolling doctrine. Moreover, even if the standard were one of actual notice, the undisputed facts of record indicate quite clearly that Mr. Grant actually knew of those facts alleged in plaintiff's complaint to have constituted the wrongdoing complained of.

### 1. Constructive Notice

Apparently aware that Mr. Grant's former position as a Director and Executive Vice President of U.S. News would ordinarily be such as to impute notice to him, plaintiff seeks to avoid that obstacle to its tolling claim by asserting that the U.S.

News Board was bifurcated into a "news" and a "business" side. Although plaintiff concedes, as it must, that Mr. Grant moved from the "news" side to the "business" side, plaintiff attempts to minimize his participation in the business affairs of the company by claiming that he really was not on the business side at all. Accordingly, plaintiff adduces the testimony of Mr. John Adams, a colleague of Mr. Grant on the Board, who states that "Ben Grant ... was kind of a bridge man, outside speaker man who had come over from the news department and was given a fancy title."[9] Deposition of John H. Adams (Apr. 22, 1985) at 9. Mr. Adams goes on to say that "mainly Ben went around the country and made speeches on behalf of the magazine...." *Id.* at 10. That characterization of Mr. Grant's activities is repeated by another fellow Board member, Affidavit of John Kirby ¶ 5, Pls.App. at 7,[10] and by Mrs. Grant, who states that her husband was a "goodwill ambassador," Affidavit of Elizabeth B. Grant ¶ 9, Pls.App. at 3, and a "public relations representative." *Id.* ¶ 10. Both Mr. Kirby and Mrs. Grant state, in the same terms, that Mr. Grant was not a "sophisticated businessman." Kirby Affidavit ¶ 6; Grant Affidavit ¶ 19. In short, plaintiff relies exclusively on flat, generalized assertions that Mr. Grant had no dealings with the "business" side of the company and upon opinion testimony that Mr. Grant was not generally knowledgeable about business affairs.

 Even if it were true that the operations were crisply divided into a news and business side, such a division, without more, would not exempt Grant from the general duty incumbent upon a director to keep himself at least minimally aware of corporate affairs. A director cannot claim ignorance of "matters fairly disclosed by the directors' meetings and those corporate records to which the directors had access." *Federal Deposit Ins. Co. v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir.1980); *accord Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). While it is true that notice will not be imputed to a director simply by virtue of his position if his fellow board members actively concealed information from him, *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.1965), there is nothing in this record to suggest nor is there any claim that Mr. Grant's colleagues on the Board deliberately withheld any material facts from him. On the contrary, as will be discussed below, Mr. Grant had actual notice of facts relevant to the claims asserted in this complaint. To that extent, even if his fellow directors had sought to withhold information from him, they could not have been successful.[11]

**2. *Actual Notice***

While plaintiff has attempted to shield Mr. Grant from the general duties incumbent upon corporate directors by claiming that the company was divided into news and business departments, it is clear from the record that neither did such a rigid division exist in theory, nor did it preclude Mr. Grant from notice in practice.

First, it is simply not true that directors on the "news" side had no dealings with general corporate affairs. Mr. Adams, for instance, who had served as Managing Editor, Deposition at 6, was also a member of the Profit-Sharing Committee, *id.* at 25, which administered the Plan. Similarly, Mr. Grant, while perhaps a "public rela-

---

**9.** Presumably, the "fancy title" was that of Executive Vice President. It should be pointed out that Mr. Adams, at the time his deposition was taken, was—like plaintiff—a member of the *Foltz* class. Again, just as plaintiff, he filed a separate action subsequent to his exclusion from the class, but later his suit was dismissed with prejudice.

**10.** References to appendices of exhibits submitted by the parties in conjunction with their statements and counter-statements of material facts not in dispute will be given as Pls.App. (plaintiff's Appendix) and Defts. App. (defendants' Appendix).

**11.** Of course, as soon as Mr. Grant became aware of enough facts to be put on inquiry notice, he fell under the general duty to exercise due diligence in seeking to uncover a cause of action. His concomitant duty as a Director was at least as stringent.

tions representative" or "goodwill ambassador," actively engaged in affairs on the business side of the Company. He voted on the payment of stock dividends and contributions to the pension and Profit-Sharing plans, on whether the Company should continue the stock bonus plan, and on the award of deferred compensation rights to fellow directors. Defts.App. at 21–36, 41–42, 44–53. Of even greater significance, as a member of the Madana Board, Mr. Grant played a more or less active part in the discussion of plans for the future development of the Company's real estate holdings. He attended meetings of the Boards of U.S. News and Madana, at which various plans for development were considered. At one such meeting, Oliver T. Carr of the Oliver T. Carr Company, a prominent Washington construction and development firm, made a presentation concerning such development. *See* Defts.App. at 190–213. At that time also, U.S. News joined with a consortium of owners of substantial properties in the West End, known as West End Planning, Inc., in creating a commercially attractive plan for development in the area, to be submitted to the District of Columbia government for consideration. Indeed, it was Mr. Grant who placed before the Madana Board the motion to adopt a resolution supporting the West End Planning proposal. Defts.App. at 213. The assertion, then, that Mr. Grant was not involved with the business activities of the company is simply untenable.

▇▇▇ Not only does the record reveal that the wall allegedly separating Mr. Grant and the "news" side of the magazine from the business affairs of the company was at least permeable, but it also indicates that Grant had knowledge of facts underlying the present suit. Through his participation on the Madana Board, Mr. Grant certainly knew that the company's real estate was of great potential value. Through

his attendance at the 1974 Annual Shareholder Luncheon, Defts.App. at 136, Mr. Grant heard—if he was not already aware—that the real estate was carried on the books at only one-third of current value, *id.* at 137, and that American Appraisal determined the value of the Company's stock in part by comparing it to the earnings capacities of the publicly traded stock of comparable businesses. *Id.* at 141. Those two items of information, combined with his knowledge of the status of the real estate development plans, should have been enough to put Mr. Grant on notice that (1) the real estate was being conservatively appraised, and (2) that no "control premium" was being attributed to the fact that the Plan owned a controlling block of the company's stock,[12] the two aspects of the year-end 1974 appraisal that plaintiff contends were most wrongful. Moreover, the annual appraisals were a topic of discussion at meetings of the U.S. News Board. Deposition of John H. Adams at 10. While plaintiff attempts to make much of the fact that no formal appraisal reports were prepared for the years 1971 through 1973, whatever information that they might have contained was simply not necessary to put Mr. Grant on notice of the fact that the Company's real estate holdings did not figure highly in American Appraisal's valuation of the U.S. News stock. Moreover, even if such information might have been helpful, absent *fraudulent concealment* of facts such as would have put Mr. Grant on notice of a potential claim, the statute will not be tolled.

▇▇▇ It is not disputed that Mr. Grant was disappointed with the value of $65 per share placed on his retirement benefits and that he complained to John Sweet of his dissatisfaction. Affidavit of Elizabeth B. Grant ¶ 17, Pls.App. at 4; Deposition of Howard W. Flieger (Mar. 28, 1985) at 12. Knowing that the company was valued on a

---

12. In *Foltz,* the Court ruled that presence at the 1974 Shareholder Luncheon was not deemed sufficient to put the class plaintiffs on notice of facts that they characterized as constituting improper appraisal techniques. However, those plaintiffs were not insiders like Mr. Grant who

should have been able to appreciate fully what was being said; they were employee shareholders. In addition, it was not certain which of them were at the Luncheon. *See* 627 F.Supp. at 1151–52.

minority basis, Mr. Grant could have easily determined the entire appraised value of U.S. News by multiplying $65 by the approximate number of outstanding shares. Then comparing this figure with what he knew or considered the real estate to have been worth, by virtue of his involvement with current development plans, Mr. Grant would have been able to form an opinion as to whether the appraisal adequately took into account the "true" value of the real estate. If he had any doubts after such a comparison, he need only have asked to see the 1974 appraisal report.[13] Any potential claim against U.S. News would have thus been apparent in 1975, or soon after Mr. Grant left the magazine.

■ Perhaps most indicative of Mr. Grant's lack of diligence in following up upon what should have constituted knowledge of a potential claim is his lack of response to a letter he received in August of 1981 from Owen Scott, a former director of the Company. In that letter, Mr. Scott describes the "vast development projects that [were] ahead for the U.S. [News] property." Defts.App. 174. Mr. Scott contrasted the future prospects for development with the modest beginnings made when Mr. Grant was with the Company, *id.* at 175–76, concluding with the observation that henceforth "[t]he value of the stock at least [would] reflect the new valuation on the land...." *Id.* at 177. It was precisely this contrast between past and current valuation of the Company's real estate that impelled the *Foltz* plaintiffs to file suit in February 1984, many months before the Company was actually sold. Grant, by contrast, despite his disappointment in the price he received per share, did nothing to investigate a potential claim after receiving news from Mr. Scott that current employees would be enjoying the fruits of development projects begun when Mr. Grant was still with the Company. It is such an ab-

sence of diligence that defeats plaintiff's claim that the statute should be tolled.

## CONCLUSION

While "[i]t is one thing to toll the statute of limitations until a reasonable plaintiff could undo the effects of concealment[,] [i]t is quite another matter to discharge a plaintiff completely from his usual obligations to conduct reasonable inquiries into the grounds supporting his cause." *Hohri*, 782 F.2d at 248. The undisputed facts of record do not reveal that Mr. Grant was a passive member of the U.S. News and Madana boards of directors. As both a corporate director and officer, he was chargeable with notice of those facts which corporate records, financial and otherwise, would clearly disclose and in this connection reasonable due diligence is expected of a person in his position. He was chargeable with awareness of matters fairly ascertainable from the records and day-to-day activities of the Company. There may be exceptions, of course, upon a claim and a showing that relevant documents were wrongfully withheld but such has not been demonstrated here. It appears from the record in this proceeding that Mr. Grant was in a position to know the facts underlying what plaintiff now charges was wrongful conduct. If he had any doubts as to those facts, he was bound to exercise reasonable diligence in inquiring further into any matters of concern. The argument that he was somehow relieved of any duty to maintain an awareness of company affairs because he operated somewhere on the fringes of the organization is untenable both in theory and in practice. As a matter of law, Mr. Grant's position on the Board of Directors and as Executive Vice President was sufficient to impute notice to him, absent record evidence of any attempt by his fellow directors to dupe him. As a matter of practice, Mr. Grant actively en-

---

**13.** That the final report was received at U.S. News subsequent to Mr. Grant's retirement is not relevant; if he had doubts about the propriety of the appraisal—which he could have had—the exercise of due diligence would have re-

quired him to ask to see a copy. It is undisputed that he did not pursue the matter of his retirement benefits beyond the initial complaint to Mr. Sweet.

gaged on a day-to-day basis in the corporate management department and on the business side of the Company. Any attempt on the part of his colleagues to deceive him could not have been successful, unless of course he had been neglectful of his duties as director and unreasonably inattentive as a potential plaintiff. Finally, the record reveals that Mr. Grant had actual notice of facts underlying plaintiff's suit such as to preclude tolling of the statute.

Accordingly, the Court **grants** defendants' motion for summary judgment on the grounds that plaintiff's claims are time-barred.

An appropriate Order will be entered.

### ORDER

**(Granting Defendants' Motion for Summary Judgment)**

June 12, 1986.

In accordance with the **Memorandum Opinion** issued on this date, it is

### ORDERED

That defendants' motion for summary judgment is **granted** and this proceeding is **dismissed with prejudice.**

### ORDER

(Granting Defendants' Motion for Summary Judgment)

July 2, 1986.

In accordance with the Memorandum Opinion issued on June 12, 1986, it is

### ORDERED

That the Court's Order of June 12, 1986 is vacated; and

That defendants' motion for summary judgment is granted and the claims asserted against them by the plaintiff are dismissed with prejudice.